[Civil No. 3328. Filed December 9, 1933.]

[27 Pac. (2d) 678.]

S. A. GERRARD COMPANY, INC., a Corporation, Appellant, v. L. H. FRICKER, Appellee.

Mr. Thomas A. Flynn, Mr. Joseph M. Holub and Mr. Allan K. Perry, for Appellant.

Messrs. Beer, Walsh & Wilmer, for Appellee.

ROSS, C. J.—The Gerrard Company appeals from a judgment against it for damages to Fricker's apiary. We shall refer to the parties as plaintiff and defendant.

The plaintiff's apiary is located near Chandler in Maricopa county, and adjacent thereto the defendant was growing 105 acres of lettuce. In the process of spraying an insecticide called Dutox No. 20 on defendant's lettuce field to rid the field of worms, the spray fell upon, or was blown upon, the plaintiff's apiary, with the result that his bee business was damaged. The spraying was done from an airplane flying over the lettuce field and as plaintiff claims over his apiary and releasing the dust or spray. The defendant did not itself operate the airplane, but it employed the Hawks Crop Dusting Company to do the spraying. This corporation was engaged in that particular kind of work. It furnished its own pilots and airplanes and in the operation was not under the control or direction of the defendant. Only the powder or dust was supplied by defendant. This powder or dust was fatal to lettuce worms, and to bees, judging from what happened in this case. The spraying was done October 11, 1931, between 8 and 9 o'clock in the morning, and consumed about twenty-five minutes. At 4 o'clock in the afternoon the bees were flying around, buzzing, and dropping, some were dying. They were scattered all over the yard. The death rate was greatest for about four days, but continued for nine days. Most of the workers were killed. Some of the brood died because there were not enough workers to keep the brood warm. Many queens died, and all of them quit laying.

The plaintiff had 383 colonies, averaging from four to five pounds of bees, or 20,000 to 25,000 bees, in good healthy condition before the dust was released

on them. He employed two apiculturists to assist him in salvaging as much of his apiary as possible and paid them for their services $100.

He fed the bees during the months of October, November and December, 1931, and January, February and March, 1932, $100 worth of honey. He spent ten days of each of said months caring for the bees and feeding them, for which he claimed a compensation of $300.

There were so few bees left in some of the colonies as to make it necessary to unite them with other depleted colonies and in this way 75 colonies were entirely absorbed. This left 308 colonies averaging from a pound to a pound and a half, or from 5,000 to 7,500 bees, mostly young ones, the old ones having died or been killed off.

The market value of a colony of bees in good condition was $7.50. The market value of plaintiff's bees after rebuilding was $3 per colony.

The trial was before a jury and resulted in a verdict and judgment for plaintiff for $2,000.

Defendant denied any liability and did not contest or introduce any evidence on the question of the amount of damages plaintiff suffered.

Defendant's assignments of error raise four questions of law. It contends: (1) That the Hawks Crop Dusting Company was an independent contractor, and that therefore defendant was not liable for any damage suffered by the plaintiff; (2) that, since plaintiff alleged that his bees were poisoned, he must show that the substance that killed them was poisonous, which he has failed to do; (3) that the instructions were erroneous in assuming that the Dutox dust or powder was in fact a poison; and (4) that the verdict was excessive in that the greatest loss proved did not exceed 75 colonies at $7.50 per colony.

As a general rule the employer is not liable for the negligence of an independent contractor. There are,

however, certain exceptions to this general rule. One of such exceptions is that the law will not allow one who has a piece of work to be done that is necessarily or inherently dangerous to escape liability to persons or property negligently injured in its performance by another to whom he has contracted such work. This is especially true where the agency or means employed to do the work, if not confined and carefully guarded, is liable to invade adjacent property, or the property of others, and destroy or damage it. The defendant was within its legal rights in depositing the insecticide on its lettuce field for the purpose of ridding it of the worms with which it was infested, and it could do this work itself or it could contract it, but, because of the very great likelihood of the poisonous dust or spray spreading to adjoining or near-by premises and damaging or destroying valuable property thereon, it could not delegate this work to an independent contractor and thus avoid liability. 39 C. J. 1331, § 1540; 14 R. C. L. 87, § 24; *Medley* v. *Trenton Inv. Co.,* 205 Wis. 30, 236 N. W. 713, 76 A. L. R. 1250; *St. Louis & S. F. R. Co.* v. *Madden,* 77 Kan. 80, 93 Pac. 586, 17 L. R. A. (N. S.) 788. We conclude that the facts bring the case within the named exception, and that, because of the dangerous character of the agency employed, the work was not delegable, and that the Hawks Crop Dusting Company was in the performance thereof the agent or servant of the defendant.

There is nothing to defendant's second point, as we see it. The plaintiff alleged that the Dutox spray or dust was poisonous, and that the poison killed and damaged his bees. The evidence that it was poisonous was very meager aside from the fact that it killed most of the bees that it contacted. If it killed the bees, it was because they inhaled it. It was poisonous to them.

The instructions must be construed together and as a whole. The Dutox powder was referred to in the instructions as "this poison" several times. The jury was instructed: " . . . It is incumbent upon him (plaintiff) to prove that this substance was a poisonous substance and that it was because of the poisonous character that his bees were killed." With the direct duty placed upon the jury to find that the powder was poisonous, we think the reference in other parts of the instructions to the powder as "this poison" could not have been misunderstood, and that therefore assignment No. 3 is without merit.

The question of the measure of damages where they are for bees killed or for the destruction of or injury to bee colonies we find is entirely a new one. Counsel for plaintiff state that they have found no case announcing the rule. The defendant has cited no case, and we have found none. We think the rule must be the one ordinarily applied for the destruction of or injury to personal property in general. This rule we find is:

"Definite rules which will measure the extent of recovery in all cases even of a particular class are difficult to formulate owing to the consideration which must be given in each case to its specific and perhaps peculiar surrounding circumstances. Stated in broad terms, however, the measure of damages is such sum as will compensate the person injured for the loss sustained, with the least burden to the wrongdoer consistent with the idea of fair compensation, and with the duty upon the person injured to exercise reasonable care to mitigate the injury, according to the opportunities that may fairly be or appear to be within his reach. . . . " 17 C. J. 844, § 166.

The damages plaintiff suffered are under the evidence fairly susceptible of computation. We should bear in mind that a colony or hive consists of the box that houses it, the worker bees, the drones and the queen. The workers are the most numerous and are

the ones that collect honey, honeycomb and bee bread. A few are nurses or guards and attend or wait on the queen. The drones are for mating with the queen, and only one of them may enjoy that privilege. The queen lays the eggs for the colony and in doing so measures the needs of the colony with an accuracy something like the accuracy that mercury gauges heat and cold. If there is a good flow of honey in prospect the queen by a bountiful crop of eggs supplies the needed workers to gather it, but if the flow is poor or the prospect not promising she retrenches in the egg crop. The colony is a unit. The worker bees, the drones and a queen together are valuable, but separate them and they are valueless. So a colony or hive must be thought of and treated as a unit, just as a cow or sheep is thought of and treated as a unit. As the owner may recover damages for the breaking of his cow's or sheep's leg, so may the beekeeper recover damages to his colony or hive caused by the killing or weakening of his bees. The killing or destroying of a few bees of a hive or the major portion thereof is an injury to the colony. Damages would be to the colony and not for the value of the bees as separate entities. We think the true measure of damages as applied to the facts is the difference between the market value of the colonies at the time they were damaged and their value after they were rebuilt, together with the reasonable expenses incurred by plaintiff in an effort to mitigate or keep down the loss as much as possible. Of course, where the colonies were entirely lost or destroyed, plaintiff would be entitled as damages to the market value of them at the time of their loss or destruction. According to the rule stated, the jury might have allowed the plaintiff the following damages, there being some evidence to support such damages:

| | |
|---|---:|
| The market value of 75 colonies destroyed or absorbed, $7.50 each or ............. | $ 562.50 |
| Damages to 308 rebuilt colonies at $4.50 each ............................... | 1,382.00 |
| Wages of two apiculturists ................ | 100.00 |
| Honey fed to bees ........................ | 80.00 |
| Wages of plaintiff for extra work caused by the poisoning of bees ................. | 300.00 |

A total of ........................ ...........$2,428.50.

In addition to the above items of damage plaintiff claimed damages by reason of the loss of increase, fixed at 250 hives. This claim, it seems to us, is entirely too speculative and uncertain. While the bee is industrious, dependable and intelligent, it is short-lived. Sixty to ninety days is his allotted time. The span from October 11th to spring, when the bee swarms, is greater than the life of the bee. What colony or how many would have doubled and swarmed in the following spring is too much of a guess to be the basis of a claim for damages.

There was also a claim for loss of honey, but it was entirely without support in the evidence.

The verdict was not excessive. The amount found as plaintiff's damages is well within the proof after excluding increase and honey lost. There was evidence of more damages than the loss of 75 colonies.

It is difficult, however, to square the verdict with the court's instruction. The learned trial judge ruled out the expenses incurred in an effort to mitigate the plaintiff's loss by rebuilding, feeding and caring for the 308 hives saved, and limited the jury to finding the market value of the bees actually killed. We quote his instruction, as follows:

"There has been some evidence here by the plaintiff of what he alleges to be mitigation of damages. However, there is no mitigation, there could have been no mitigation of damages here because if any of

the bees were killed by this poison they were killed right away, that is, within a few hours, and when they were dead the damage was all done, so the damage that he has sustained, if any, was whatever bees were killed by this poison were worth at that time. To illustrate, he could have gone on the open market and bought other bees to take the place of the bees that were destroyed and kept on from that point. Therefore, as I say, there was no necessity for mitigation of damages and he can recover nothing for what these dead bees would have produced had they lived out their natural life, because it was possible for him to have gone on the open market and purchased other bees to take their place, and thus he would have procured the honey which those bees would have produced. So the only damage, if any, would be just what those bees that were killed by the poison were worth at the time they were killed."

This rule is not in accordance with our views. It does not permit the jury to find the extent of the damage to plaintiff's hives as units, but requires that the jury ascertain the value of the individual bees killed. This must be wrong. The evidence was confined to the value of the bees as an integral part of a colony or hive, as, for instance, the witnesses said a hive was worth so much; a hive consisted of so many pounds of bees, or so many bees; a hive was depleted or damaged. There was no evidence upon which to base or from which to calculate the damages, as this instruction would require.

We know of no rule of law that requires a person whose property has been wrongfully injured or destroyed to go into the open market, as the court states, and buy substitutes, or, as here, "other bees," in order to claim damages from the wrongdoer or to mitigate them.

There was neither evidence nor law supporting the court's instruction. Under such circumstances, the verdict, being within the issues and being supported by credible evidence, should be upheld. The defend-

ant, it is true, asserts that the verdict is excessive, yet at the trial it introduced no evidence whatever contradicting the evidence of plaintiff as to the amount of the latter's damages. Defendant apparently is satisfied with the court's instruction as to the proper way of ascertaining plaintiff's damages, for it has not assigned the instruction as erroneous and so far as it can has waived the error. Evidently the framers of our Constitution must have had in mind errors of this kind when they inserted in that instrument (section 22, article 6):

"No cause shall be reversed for technical error in pleading or proceedings when upon the whole case it shall appear that substantial justice has been done."

The judgment is affirmed.

LOCKWOOD and McALISTER, JJ., concur.