4-5748 136 S. W. 2d 484

Opinion delivered January 22, 1940.

*J. T. Cheairs,* for appellants.

*Carneal Warfield,* for appellees.

Holt, J. Appellees, Stedman Dodson and Mrs. J. D. Williams, filed separate suits in the Chicot circuit court against appellants, The Hammond Ranch Corporation and Homer Ricks, to recover damages growing out of the

alleged negligence of appellants in spreading arsenic poisoning, resulting in injury and death to certain stock. The actions were consolidated for trial.

Appellee Dodson alleged in his complaint that appellants employed the Silver Fleet Dusting Company to spread arsenic poison over a field of cotton belonging to them and adjacent to appellee's pasture; that the poison spray was spread by means of an airplane, and that appellants wantonly and negligently spread the poison over appellee's pasture, rendering same unfit for use for a period of seven days and causing the death by poison of one heifer of the value of $25, one mule the value of $125, and damages in the sum of $15 paid out for hay by appellee for his stock, or a total of $165.

Appellant, Hammond Ranch Corporation, filed separate answer denying every material allegation of appellee, and further alleged that it had nothing to do with the employment of the dusting company in question, was not responsible for its acts, and that, if such company were employed to spread the poisonous spray, it was at the instance of Homer Ricks, and that it is in no way liable for same.

Appellant, Homer Ricks, answered denying every material allegation set out in appellee's complaint.

Appellee, Mrs. J. D. Williams, in her complaint made similar allegations to those set out by Dodson and claimed damages for the death of one Jersey milk cow of the value of $75 and one part Jersey milk cow of the value of $50, or a total of $125. To this complaint, appellants filed answers similar to those in the Dodson case.

Upon a trial to a jury a verdict was returned in favor of appellee Dodson in the sum of $100 and for Mrs. Williams in the sum of $125. From a judgment on these verdicts comes this appeal.

The evidence, as reflected by the record, stated in its most favorable light to appellees, is to the following effect:

The pastures of appellees adjoined the land occupied by appellant, Ricks, who was the tenant of The

Hammond Ranch Corporation, owner of the property which Ricks occupied.

An employee of appellant, Hammond Ranch Corporation, testified that appellant, Homer Ricks, was a tenant of the Ranch "on the third and fourth"; that if any tenant wanted his cotton dusted or the arsenic poison spray spread over it, he might do so, that it was optional. If the tenant did have his cotton dusted, then the appellant Ranch furnished and paid for one-fourth of the poison used in spraying; and that The Hammond Ranch Corporation paid for one-fourth of the poison spray used by appellant, Ricks.

This witness further testified that when the Silver Fleet Dusting Company (quoting from his testimony) "came in there to do this they came up there to see me. They said they had an entomologist going over the place looking at the fields where it needed poison, and I told them that where it needed to be poisoned, that where it was all right with the tenant they could go ahead, if it was all right with the tenant. But the tenants, where we had security for our money, it didn't matter."

Appellee, Dodson, testified that on Sunday morning, August 15, 1937, an airplane passed over his pasture a little after sun-up; that he was standing on his porch and saw the airplane scattering the poison, but did not know it was poison at the time; that he would fly over his pasture, circle and then drop down and go back over appellants' field, make another circle and come back over his pasture and the pasture of appellee, Mrs. Williams. The operator of the plane did not cut off his poison spray when he made the circles. Appellee's pasture contains 20 acres. He immediately went to his pasture and saw something white all over the ground, and on the same day one of his mules got sick and one of his cows was down. He immediately called Dr. Moore, and after he had examined the animals said they were poisoned. One of his heifers of the value of $25, in the pasture at the time, died that day, and he thought she died from poison. The mule valued at $125 died three or four months

later. A Mr. Bufkin, bookkeeper for appellant, Hammond Ranch Corporation, told witness that the Hammond Ranch Corporation was paying for the airplane and dusting. None of the animals were sick before the cotton was sprayed with the poison except the mule which had a carbuncle. No autopsy was performed on the stock. He watered the yearling on Saturday, and when he went back to look for his cows on the following Sunday, the day of the spraying, he found the yearling dead.

Appellee, Mrs. Williams, testified that she was not at home on the Sunday morning the poison was spread on her pasture, but returned that night. She found two of her Jersey cows sick. They kept getting worse until they died, two weeks later. She had a doctor with them, and he said they were poisoned. One of the cows was of the value of $75 and the other, $25.

A Mr. A. L. Parker testified on behalf of appellees. We set out the abstract of his testimony as copied from appellants' brief: "I live out east of Chicot. I know Mrs. Williams and Stedman Dodson. Live near both of them. Both of them had a pasture near Homer Ricks' field in 1937. I saw the airplane sailing over right where I live. I hadn't got up yet. It come right on over my house and went over Mr. Ricks and hit his cotton south and then went north. Then he turned west and failed to shut the poison off. He came right by Mrs. Williams across her pasture to Mr. Dodson's. The poison was on all the way; it never did shut off. I live one-half mile of Mrs. Williams and Mr. Dodson. I generally pass there once a week. I seen the stock in there that Sunday. I passed there in an hour after the plane put poison in the pastures, and saw poison all over the leaves and grass. I didn't see any dead animals Sunday morning, but did on my way back when I found two, one up at Mr. Dodson's close to the house. It was about five hours from the time I passed before I came back. Dodson had a fat fine yearling that I offered him twelve dollars for, and he wouldn't take it."

Doc Moore testified (quoting from appellants' abstract): "I have been studying the ailments of animals

since '82. Last August a year ago I was called about the middle of August to treat animals for Stedman Dodson and Mrs. Williams. At Mr. Dodson's I found a sick mule, an old mule in bad shape, I treated him and told Mr. Dodson what to do with it. Then I was called by Mrs. Williams here somewhere close to the same time. She had a couple of very sick cows; I treated them with an old army remedy. Later on both died. According to my experience, I never seen the arsenic, but they said the pasture had been poisoned. They acted like they were poisoned by arsenic. One of the cows looked to be a pure bred jersey, and the other didn't appear to be much sick at the time."

He further testified that arsenic poisoning is a slow rot, and sometimes an animal might lie around for several months before the poison became fatal, it depended upon the amount consumed.

It is first insisted by appellants that the evidence is not sufficient to take either case to the jury. We are of the view, however, that when the above testimony, in connection with other evidence of probative value disclosed by the record is considered, we would not be warranted in saying that it is not substantial and sufficient to go to the jury.

We think, also, that there was sufficient evidence to go to the jury in support of the allegation that a poisonous spray containing arsenic, highly dangerous to animals, was spread upon the pastures of appellees; that immediately thereafter the animals in question, which were in the pastures at the time, became sick, one died on the day the poison was spread and the other shortly thereafter. There is no evidence that these animals had been sick before the spreading of the poison. It is undisputed that the arsenic spray in question is a poison, and, when taken into the system of an animal in sufficient quantity, will kill.

After considering all reasonable inferences to be drawn from the testimony as presented by the record, we think the jury was justified in finding that the dam-

ages claimed resulted from the spreading of the poisonous spray, and therefore the trial court did not err in refusing to take these cases from the jury.

It is next insisted that appellant, Homer Ricks, furnished the poison, that the dusting company did the spreading; that the dusting company was an independent contractor, and that since appellant, Hammond Ranch Corporation, had nothing to do with the employment of the dusting company, neither of appellants can be held liable to appellees. We cannot agree.

The record reflects that appellant, Homer Ricks, was a tenant of the Hammond Ranch Corporation and paid to it one-fourth of all cotton which he produced. The ranch corporation was consulted by the dusting company relative to the spraying of Ricks' cotton and was told by the ranch corporation to do the dusting where it needed to be poisoned, with its airplane, if the tenant Ricks wanted it done. The ranch corporation paid for one-fourth of the poison used on Ricks' cotton. We think, therefore, under these circumstances that the jury was warranted in holding that both appellants were jointly liable for the damages incurred. We are also of the view that the Silver Fleet Dusting Company was not an independent contractor.

In the comparatively recent case of *S. A. Gerrard Company* v. *Fricker,* 42 Ariz. 503, 27 Pac., 2d Series, 678, where the facts are somewhat similar to those in the instant case, principles of law were announced which we think are controlling here. In that case the facts were that in the process of spraying an insecticide called Dutox No. 20 on defendant's lettuce field to rid the field of worms, the spray fell upon, or was blown upon, the plaintiff's apiary, with the result that his bee business was damaged. The spraying was done from an airplane flying over the lettuce field, and as plaintiff claims, over his apiary and releasing the dust or spray. The defendant did not, himself, operate the airplane, but it employed the Hawks Crop Dusting Company to do the spraying. This corporation was engaged in that particular kind of work.

It furnished its own pilots and airplanes, and in the operation was not under the control or direction of the defendant. Only the powder or dust was supplied by defendant.

In that case one of the defenses interposed was that the Hawks Crop Dusting Company was an independent contractor, and that, therefore, defendant was not liable for any damage suffered by the plaintiff. On that question the court said:

"As a general rule the employer is not liable for the negligence of an independent contractor. There are, however, certain exceptions to this general rule. One of such exceptions is that the law will not allow one who has a piece of work to be done that is necessarily or inherently dangerous to escape liability to persons or property negligently injured in its performance by another to whom he has contracted such work. This is especially true where the agency or means employed to do the work, if not confined and carefully guarded, is liable to invade adjacent property, or the property of others, and destroy or damage it. The defendant was within its legal rights in depositing the insecticide on its lettuce field for the purpose of ridding it of the worms with which it was infested, and it could do this work itself or it could contract it, but, because of the very great likelihood of the poisonous dust or spray spreading to adjoining or nearby premises and damaging or destroying valuable property thereon, it could not delegate this work to an independent contractor, and thus avoid liability. 39 C. J. 1331, § 1540; 14 R. C. L. 87, § 24; *Medley* v. *Trenton Inv. Co.*, 205 Wis. 30, 236 N. W. 713, 76 A. L. R. 1250; *St. Louis & S. F. R. Co.* v. *Madden*, 77 Kan. 80, 93 P. 586, 17 L. R. A., N. S., 788. We conclude that the facts bring this case within the named exception, and that, because of the dangerous character of the agency employed, the work was not delegable, and that the Hawks Crop Dusting Company was in the performance thereof the agent or servant of the defendant."

Appellants finally contend that the court erred in refusing to give certain requested instructions, which we

deem unnecessary to set out. Suffice it to say that we have carefully examined these instructions and have reached the conclusion that the court did not err in this regard.

On the whole case we conclude that the judgment should be affirmed, and it is so ordered.