194 P.2d 454

**LUNDBERG et al. v. BOLON.**

**No. 4922.**

Supreme Court of Arizona.

Jan. 12, 1948.

As Modified on Rehearing May 18, 1948.

Robert Denton, of Casa Grande, and Jennings, Strouss, Salmon & Trask, J. A. Riggins, Jr., and Henry S. Stevens, all of Phoenix, for appellants.

Dwight L. Solomon, of Phoenix, for appellee.

STANFORD, Chief Justice.

This is an appeal from a judgment rendered in the trial court on a verdict of a jury.

Appellant Wheelis was growing a crop of cotton on leased land south of Eloy, Arizona. A highway separated the cotton land referred to from desert land owned by appellee. Upon the desert land appellee had sixty-four stands, or colonies, of bees. The cotton crop, being infested with insects, required dusting with an insecticide, and for that purpose Harold F. Lundberg was procured by the other appellant to do the dusting. On the morning of July 24, 1944, at about daylight, the appellant commenced dusting the said tract of cotton with his airplane and continued with such work for about two hours, when the job was finished.

Although the desert land of appellee was next to the road that divided the two pieces of property, the cotton and the desert land, the bees referred to were approximately 880 feet west of the road.

Appellee brought action against the two appellants named and in his complaint alleged: "That on said day, defendant Harold F. Lundberg, using an airplane, did so dust or spray the cotton crop of defendant Tommy Wheelis with poisonous chemicals or insecticides, and performed the work in such negligent manner that the poisonous chemicals or insecticides, in spray or dust form, drifted over and upon plaintiff's land, and over, against, upon and into, said stands of bees, and killed all of the bees therein."

At the close of appellee's case appellants moved for a dismissal of appellee's case. This motion was denied by the court. After judgment appellants moved for a new trial, which motion was also denied. The verdict of the jury was the sum of $1300. One of the grounds for new trial was "that the damages are excessive and appear to have been under the influence of passion and prejudice". Prior to the disposition of the motion for new trial appellee filed a remittitur·

in the sum of $267.20. Thereafter the court denied the motion for new trial.

On April 2, 1946, the court rendered judgment by minute entry and on the 11th day of April signed the formal judgment. Thereafter on the 22nd day of May, 1946, appellee filed "Motion to Amend Plaintiff's First Amended Complaint to Conform to the Evidence" by inserting the words "said defendants giving no notice of such dusting to plaintiff prior thereto", said insertion to be at the end of paragraph 9 of the amended complaint. The application was based on Sec. 21-449, A.C.A.1939. On the 3rd day of June, 1946, said motion was granted by the trial court.

Appellants' three assignments of error are well summarized in the following propositions of law:

"1. A verdict must be based upon the evidence, and cannot rest on conjecture, assumption, surmise, or mere possibility.

"2. Where the evidence shows the damage may have resulted from one of several causes, but only one of the causes can be attributed to the defendants' negligence, the plaintiff must fail.

"3. Where the damages assessed by the jury are excessive, a full remittitur of the excess should be made or the court should grant a motion for new trial."

In support of this proposition of law appellants claim that " * * * no evidence whatsoever was introduced to show the relationship between cause and effect. * * *

There is no evidence of a chemical analysis of any of the dead bees, nor is there any evidence tending to prove that bees can be killed by such an insecticide coming in contact with them. In order to find that the bees were killed by reason of this insecticide drifting on to plaintiff's property, it is necessary to assume evidence which is not present in the record."

Appellants claim that in bringing in a verdict as in this case it became necessary for the jury to base its findings on conjecture, speculation and assumption. Appellants quote the following rule from 32 C.J. S., Evidence, § 1042:

"A verdict or finding must be based on the evidence and must be based on the facts proved. Under this well established rule the verdict or finding cannot rest on surmise or speculation. Likewise, under the above mentioned well established rule a verdict or finding cannot rest on conjecture. Likewise, under the above mentioned well established rule a verdict or finding cannot rest on guess, supposition, assumption, imagination, or suspicion.

"The evidence on which the verdict or finding is based must be competent, legal evidence, and must support every material fact; and where there is no evidence, or the evidence as to a material issue is insufficient, the decision should be against the party having the burden of proof. The evidence must be sufficient to warrant a reasonable belief in the existence of those facts which the verdict or finding establishes;

the verdict or finding must be grounded on a reasonable certainty as to probabilities arising from a fair consideration of the evidence, and not on mere possibilities."

Appellants also quote the following from our case of Salt River Valley Water Users' Association v. Blake, 53 Ariz. 498, 90 P.2d 1004, 1007: "* * * We have repeatedly held that juries may not return verdicts on surmise or speculation, and that when damage may have resulted from one of several causes, and that it is as probable that it may have been a cause for which defendant was not responsible as one for which it was, a plaintiff may not recover."

Also appellants quote from the case of Brutinel v. Nygren, 17 Ariz. 491, 154 P. 1042, 1048, L.R.A.1918F, 713: "* * * To sustain the judgment in this case it would be necessary to hold that the jury in arriving at their verdict have a legal right, in the absence of any evidence in regard thereto, to conjecture and assume necessary and controlling facts, which, under the law, is beyond the province of a jury. * * *"

In order to determine this matter it is imperative that we now review a portion of the evidnece, but first we will state that there seems to be nothing in the testimony that we can find to the effect that the bees of this appellee went upon the field of cotton that was sprayed.

The testimony of DeWitt Bolon, son of appellee, was to the effect that he heard the airplane dusting; knew the sound of a dusting plane, and he thereupon went to the field where the bees were located, and stated: "I drove to the bee yard and observed that the dust was very dense, and I coughed, and it caused a cough, and a smarting of the eyes." Bolon also testified that about ten days before the dusting he was at the bee yard and defendant Wheelis passed at that time. This witness testified also that there was a thick grove of tamarisk trees about five miles distant from the bees.

Dr. E. S. McGregor, a witness for both sides in the case, testified that he was an apiaculturist and was then employed with the United States Department of Agriculture, cooperatively with the University of Arizona; that he saw the bees on the 1st day of August, 1944, but had not seen them before that time, and when asked what condition they were in, he replied: "They were very weak." He also testified that there were no diseases among bees that would kill them within several days time, or words to that effect. Also he testified that by test, or experiments made, bees were known to have traveled $8\frac{1}{2}$ miles for substance for their use. In addition to that, he stated that as a test on a certain occasion in a field northwest of Eloy, Arizona, the field being approximately 320 acres, he placed two hives of bees the night before the field was going to be dusted. They were placed on the northwest corner of the field at the fence approximately 20 feet from the end of the cotton rows.

" * * * One of those hives was sitting in its normal position, open, the entrance hole open, just as it would set in the apiary. The other hive was what they described yesterday as a two-story hive, and in this hive I fixed a—what you might call a screen penthouse, and screen wire all the way around the top so that air could get in, so the bees wouldn't smother, and I also screened up the hole, the entrance hole, so that bees couldn't get out, so they could get air at the bottom and at the top. They could get plenty of air, but they couldn't get out of the hive. The other hive was free to fly any time they wanted to. The field was dusted starting some time between dawn and sunup, and the dusting operation took approximately two hours, until from about —oh, say they started at 5:30, until about 7:30, approximately. I have forgotten what the time was, but that is approximate. The drift of the dust during this period was directed towards the bees, and the dusting operation started on the westward side, so that from the time the plane flew the first swath until he flew the last swath the hives were setting in the dust—or in the drift. About noon that day, while this screened hive was still closed, I, without opening it, picked it up and set it in my truck, and hauled it approximately 15 miles away and opened it up. The other one I left there about ten days—it was then ten days—and then hauled it away to the same location that I hauled the other one to.

"Q. What was the result of your experiment? A. The hive that was screened up lived on to the end of the year and into the next spring, when I quit taking observations on it. The hive that was open got weaker and weaker in bees every day and died on the 36th day."

Also the testimony of Dr. McGregor further shows that bees normally collect pollen in pellet form and in that way carry it to the hives on their legs; that the pollen in the hives, which he examined for the appellee, was in pellet form and that the bees must have carried it in that form. He said that bees could not ball the pollen from cotton blossoms because "The pollen grains from cotton are purportedly covered with a viscid material—a sticky material, and the pollen grains don't cling to each other in a sort of a stringy fashion, so the bee can't ball them into a round ball."

Malcolm F. Wharton, testified for the appellant and said that he was one of the owners of the Arizona Fertilizers, Incorporated; that he sold this particular insecticide to appellant Wheelis; that the particular kind of insecticide was "Quick Kill 15S". He said that the chemical composition of the dust which he sold was "15 per cent of this Quick Kill, or active ingredients, five per cent of an extender of fluffer called celite, which is inert, and the remainder, 80 per cent, is made up of 95 per cent sulphur finely ground." Asked what percentage is composed of arsenic or arsenic

compound he answered: "It shows on the label approximately ten per cent of the total dust applied is composed of an arsenite or arsenate." Later he testified that the arsenic was a little over twice as heavy as the celite which is the filler, and that the sulphur is more than twice as heavy as the arsenic.

In the case of S. A. Gerrard Co. v. Fricker, 42 Ariz. 503, 27 P.2d 678, 679, the pertinent facts are related as follows: "The plaintiff's apiary is located near Chandler in Maricopa county, and adjacent thereto the defendant was growing 105 acres of lettuce. In the process of spraying an insecticide called Dutox No. 20 on defendant's lettuce field to rid the field of worms, the spray fell upon, or was blown upon, the plaintiff's apiary, with the result that his bee business was damaged. The spraying was done from an airplane flying over the lettuce field and as plaintiff claims over his apiary and releasing the dust or spray. * * * This powder or dust was fatal to lettuce worms, and to bees, judging from what happened in this case. The spraying was done October 11, 1931, between 8 and 9 o'clock in the morning and consumed about twenty-five minutes. At 4 o'clock in the afternoon the bees were flying around, buzzing and dropping, some were dying. They were scattered all over the yard. The death rate was greatest for about four days, but continued for nine days. Most of the workers were killed. Some of the brood died because there were not enough workers to keep the brood warm. Many queens died, and all of them quit laying."

That case was also tried before a jury and the verdict rendered was for the plaintiff, the owner of bees, as in the instant case. On appeal the appellant assigned as error, among other things, "(2) that, since plaintiff alleged that his bees were poisoned, he must show that the substance that killed them was poisonous, which he has failed to do; * * *." This court in disposing of that assignment of error said: "There is nothing to defendant's second point as we see it. The plaintiff alleged that the Dutox spray or dust was poisonous, and that the poison killed and damaged his bees. The evidence that it was poisonous was very meager aside from the fact that it killed most of the bees that it contacted. If it killed the bees, it was because they inhaled it. It was poisonous to them."

In Hammond Ranch Corporation v. Dodson, 199 Ark. 846, 136 S.W.2d 484, an action was brought to recover damages growing out of alleged negligence in spreading arsenic poisoning by airplane and causing the injury and death of certain livestock. The dusting company spread arsenic poisoning over a field of cotton and the dust went upon an adjoining pasture and killed the animals. That case quoted our case of S. A. Gerrard Co. v. Fricker, supra, and said [199 Ark. 846, 136 S.W.2d 486]: "* * * the facts are somewhat similar to those in the instant case, principles of

law were announced which we think are controlling here. * * * "

The case of Miles v. Arena & Co., 23 Cal.App.2d 680, 73 P.2d 1260, 1261, is where there was an appeal from the judgment of the trial court awarding plaintiff damages for fifty-six hives of bees killed by drifting dust which was spread by means of an airplane on honeydew melons growing on a tract of land being farmed by A. Arena and Company. For a better understanding of a case which is similar to the instant one, we quote from the body of said case:

"Plaintiff had his bees on rented property about one-half mile northwest of the A. Arena & Co. property. The trial court found that the poisonous dust floated from the melon field to the apiary, into the hives and killed all the bees. This is ample evidence supporting this finding. There was a light wind blowing from the southeast to the northwest. Witnesses saw the dust floating in the air, like a 'fog', from the field toward the apiary. Carberry himself testified concerning the floating qualities of the dust: 'It is a good deal like road dust. There is a certain amount of air float material in any dust used to dust a crop with and this air float material will get in the air and it never comes down. I suppose it might drift that far, or ten miles, or twenty miles.'

"The trial court further found that the bees came to their death by means of the poisonous dust floating from the field to and into the hives, and not by their going in search of honey to the blossoms on the field which was being dusted. There is ample evidence to support this finding. Plaintiff testified that he found a fine grey dust in the hives and on the dead bees. All of the bees were dead, including the nurse bees and the queen bee. There is evidence that when bees go to a field that has been dusted with calcium arsenate it takes at least three weeks to kill the workers of a swarm; that the nurse bees and the queen bee never leave the hive during the honey making season. The longest period that could have elapsed between the dusting operation and the finding of the dead bees was fourteen days. Three weeks had not elapsed between the dusting operations and the finding of the bees, all dead, including the nurse bees and the queen bee. This evidence supports the inference drawn by the trial judge that the bees were killed by dust which floated into the hives and not from dust obtained by the bees from the flowers of the melon field.

* * * * * *

"We have been cited to no case involving the recovery of damages for the death of bees caused by a poisonous dust floating from a field where vegetables were being dusted to the apiary. It must be conceded that, in itself, dusting vegetables to kill pests that prey upon them is a necessary and lawful operation which the owner of the vegetables may perform, either himself or through his servants, or may have per-

formed by an independent contractor. However, he should not do the dusting, or have it done, under conditions which would indicate to a reasonable prudent person that damage to his neighbor would result.

"While we have found no case involving operations factually similar to those before us, we can see no reason why the same rule should not apply here as governs in cases where damage to a plaintiff's property has resulted from drifting smoke, dust, noxious gases or similar substances originating on a defendant's property. No person is permitted by law to use his property in such a manner that damage to his neighbor is a foreseeable result. See Restatement of the Law, Torts, § 364 et seq.

\*　\*　\*　\*　\*　\*

"The case of Centoni v. Ingalls, 113 Cal. App. 192, 298 P. 47, 48, involved damages resulting from dust floating from defendant's clay bins. It was there said: 'A property owner is entitled to the peaceful enjoyment of his property free from an unlawful invasion of his rights of ownership by the act of another. Dust constitutes a nuisance if it "causes perceptible injury to the property, or so pollutes the air as sensibly to impair the enjoyment thereof." (Citing cases.)'

"Defendants knew, or should have known, that the light dust projected under pressure onto the melons would float in the air. There is evidence that a light breeze was blowing during the dusting operations.

They should have known that the dust would float for a considerable distance when propelled by such a breeze. Dusting material containing a poison that would kill bees was used. Under the conditions prevailing at the time they should have foreseen the ensuing damage to plaintiff. It follows that they must respond in damages."

A case of aid to us in the instant one is Underhill v. Motes, 158 Kan. 173, 146 P.2d 374, 375. Sufficient facts are related by the following taken from the opinion: "Appellees and appellants are farmers. L. R. Underhill and Paul Underhill, appellees, are brothers associated in a farming enterprise. They had leased sixty acres of pasture land from the appellant, Susie Lacoe Motes. The appellant, Buard Motes, is a son of the lessor and Buard supervised the farming operations. Adjacent to the pasture appellants had an alfalfa field. It was appellees' contention Susie Lacoe Motes had furnished poison to kill grasshoppers which were infesting the alfalfa and that appellees' cows ate some of the poison near the pasture fence which separated the pasture from the alfalfa field and that the cows died as a result thereof. \*　\*　\*"

In the body of the opinion it was held: "\*　\*　\* He (one of the appellants) contends he was under no duty to notify appellees the poison had been scattered in the alfalfa field when it was scattered in a proper way. Whether the poison was properly scattered and whether adequate dili-

gence was exercised in keeping it out of the reach of appellees' stock were questions of fact for the determination of the jury. * * *"

Judgment affirmed.

LaPRADE and UDALL, JJ., concur.

STANFORD, Chief Justice.

The original opinion in this matter was handed down on January 12, 1948. Subsequently on January 26, 1948, the appellants filed a petition for rehearing with a supporting brief, to which the appellee filed his objection fortified with his authorities, and because of the complexity of the problem this Court requested that the case be reargued, which was done on February 25, 1948, since which time the members of the court have reread the evidence and considered again the legal principles involved.

The majority of the Court are now of the opinion that while a correct conclusion was reached by us in affirming the judgment, it was error to base the decision wholly upon the failure of the defendants (appellants) to give plaintiff (appellee) advance notice of their intention to dust with the poisonous insecticide in order that the latter might take the necessary steps to protect his hives of bees. (We still believe that a due regard for the rights of others should have prompted the giving of this notice even though a failure to do so would not, on that score alone, make the defendants liable in damages.)

It is ordered that the last two paragraphs of the original opinion commencing with the words "The trial court did * * *" and ending " * * * precautions were not taken.", be stricken from said opinion and the opinion is supplemented by the following:

■■ The testimony as a whole shows and the jury evidently believed that plaintiff's bees came to their death as a result of the dusting with poisonous arsenic compound of the adjacent cotton crop by the dust falling and settling around and upon the apiary and premises of plaintiff due to the negligent acts of the defendants.

" * * * This court is not the trier of the facts. It is of no moment that had we been the jury we might well have decided the other way. Assignments of error based upon the weight of evidence cannot be considered if there is any evidence to support the trial court's finding even though the weight of the evidence be against that finding. Garlington v. McLaughlin, 56 Ariz. 37, 104 P.2d 169; Ruth v. Rhodes, 66 Ariz. 129, 185 P.2d 304, and cases cited therein." Kauffroath v. Wilbur, 66 Ariz. 152, 185 P.2d 522, 524.

■ The appellants urge that they were highly prejudiced by the trial court's refusal to give the following instruction:

"You are instructed that if you find from the evidence that the damage to plaintiff's bees may have resulted from one of several causes, but that the defendant is responsible

for only one of such causes, then your verdict must be in favor of the defendants because the plaintiff has failed to prove his case. In other words, ladies and gentlemen of the jury, if you find from the evidence that the damage to the plaintiff's bees could as likely have been caused by the bees feeding on the defendant Wheelis' cotton as it could have been by the dust drifting over the hives, then your verdict must be against the plaintiff and in favor of the defendant."

Instead the court instructed the jury as follows:

"It is not enough, ladies and gentlemen, for the plaintiff to prove to you by a preponderance of the evidence that the defendant did use the insecticide upon his cotton and that it did drift over and upon and against and into the colonies of bees of this plaintiff in order to entitle him to recover at your hands, but he must go further and prove that that was the proximate cause of the death of the bees which he claims died. And by 'proximate cause', I mean that cause which in its natural and continuous sequence, unbroken by any new or intervening cause, produces the injury complained of, that is, the death of the bees, and without which the bees would not have died."

And in three other instructions the court told the jurors that if the bees were trespassers the plaintiff could not recover. The fact that the bees were trespassing was neither pleaded as a defense nor proved. There was no evidence at the trial that the

bees went into the defendants' cotton field and there ate the poison causing their death. We believe in this case that the jury was fully and correctly instructed.

■ The plaintiff concedes that the correct remittitur exacted by the lower court should have been $363.20 instead of $267.20, a difference of $96. (The defendants claimed that at least $557.60 should have been taken off.) In view of plaintiff's admission, under the powers granted us by Section 21-1832, A.C.A. 1939, we now direct that the judgment in favor of plaintiff be reduced to the sum of $936.80. With this reduction the defendants are entitled under Section 34-121, A.C.A. 1939, to recover their costs in this Court, but are adjudged to pay the costs of the court below.

As corrected and supplemented, our opinion of January 12, 1948, shall remain in full force and effect. The judgment as herein modified is affirmed.

UDALL, J., concurring.

LaPRADE, Justice (dissenting).

The judgment in the first instance was affirmed upon the theory that defendants were liable for having failed to give plaintiff notice of their intention to dust the cotton field. The portion of the original opinion now deleted by my associates read:

"The trial court did not specify the basis for its ruling awarding plaintiff damages. Unquestionably the bees belonging to plain-

tiff died as a result of the dusting with poisonous arsenic compound of the adjacent cotton crop. While it may be conjectural from the record in this case as to whether their death was caused by the spray of the poisonous insecticide coming in contact with their bodies on plaintiff's acreage or from contact with defendant's cotton crop, still we believe the evidence fully warrants a recovery upon the grounds set forth in the trial amendment, i. e., *that the defendants gave the plaintiff no notice of such dusting in order that he might take the necessary steps to protect his bees from this deadly hazard, and it is upon this latter ground that we now sustain the judgment."* (Emphasis supplied.)

We recognized and so stated that it was conjectural whether the death of the bees was caused by the dust spray of the poisonous insecticide coming in contact with their bodies or from contact with defendant's crop. On rehearing we are all agreed that the rule of liability announced by the court was arrived at inadvertently; is in derogation of the common law; and would create innumerable unanticipated consequences. The rule announced placed the responsibility for damage on lack of notice and not upon negligence. Such a rule would relieve the wrongdoer of the reasonable consequences of his tortious acts by the mere artifice of giving notice, for which no provision has been provided by statute.

Now according to the majority opinion on rehearing the judgment of affirmance is bottomed upon the negligence of defendants in causing or allowing the poisonous arsenic compound dust to fall and settle around the apiary and premises of the plaintiff, without establishing any causal connection between this conduct and the death of the bees.

This is a case which required the opinion and testimony of an expert in order that the jury might intelligently arrive at a determination. The entire case depended on *how* these bees were killed. If they were killed by the insecticide falling on the hives and the bees on plaintiff's land, then defendants were liable in damages. If, on the other hand, the bees died by reason of having come upon defendant's land to eat from the poisoned cotton, defendants were not liable in damages to plaintiff. Without some type of expert testimony the jury's verdict could have been based only upon surmise and guess, since the subject under consideration is not within the common knowledge of laymen.

In an attempt to take this case out of the realm of speculation, both sides called an acknowledged expert in bee culture, namely, Dr. S. E. McGregor, whose qualifications showed that he was employed by the United States Department of Agriculture and worked with the University of Arizona; that he had attended Texas Agricultural & Mechanical College and Louisiana State University, where he took several courses in entomology and in bee keeping. He testified that he had worked with bees in Texas, New York, Louisiana, Arkansas, and Arizo-

na; that he had kept bees commercially in Texas; and that at one time he was employed as State Bee Inspector for the State of New York. This expert, being the only person who could enlighten the jury, testified with reference to the poisonous dust here used: *"It is not known whether it will kill by contact alone."* In addition to this statement he testified as to an experiment that he had performed where he placed two hives in such a manner that poisonous dust was allowed to fall upon, in, and around the two hives. One of the hives was screened so that the bees could not get out; the other was left open. The one that was closed was open to air and the bees could breathe the dust, which was allowed to come in contact with their bodies. This condition was permitted to exist for half a day, then the closed hive was removed a distance of fifteen miles, and the bees were liberated. These bees did not die but remained healthy throughout the year. The other hive was left on the premises where first located, and the bees were free to come and go and feed off the adjacent dusted field. These bees died in a very few days. I propose this question: If the acknowledged expert did not know whether this poisonous dust would kill the bees by contact or breathing, how could the jury so determine? By bringing in a verdict for plaintiff the jury disregarded the only evidence introduced on this controlling issue. The rule in this respect is well set forth in William Simpson Const. Co. v. Industrial Acc. Commission, 74 Cal.App. 239, 240 P. 58, 59, wherein the court, in discussing the value of expert medical testimony, made this statement:

*"The rule to be drawn from these decisions, as we understand them, appears to be that whenever the subject under consideration is one within the knowledge of experts only, and is not within the common knowledge of laymen, the expert evidence is conclusive upon the question in issue. It follows that in such cases neither the court nor the jury can disregard such evidence of experts, but, on the other hand, they are bound by such evidence, even if it is contradicted by nonexpert witnesses. * * *"* (Emphasis supplied.)

Regarding uncontradicted and unimpeached witnesses, this court in Rowe v. Goldberg Film Delivery Lines, Inc., 50 Ariz. 349, 354, 72 P.2d 432, 435, said:

"* * * But it is also the rule that such triers may not disregard the uncontradicted and unimpeached testimony of a disinterested witness, unless such testimony is discredited by some of the circumstances of the case. * * *"

Again in Phen v. All American Bus Lines, 56 Ariz. 567, 571, 110 P.2d 227, 229, it was said:

"* * * We have held repeatedly that a jury may not, as a matter of law, disregard the uncontradicted testimony of disinterested witnesses in regard to a fact. * * *"

I submit that the jury arrived at their determination by conjecture and guess, which guess is confirmed by the majority opinion.

The majority opinion on rehearing makes this statement: "The testimony as a whole shows * * * that plaintiff's bees came to their death as a result of the dusting * * * by the dust falling and settling around and upon the apiary and premises of plaintiff * * *." The majority states that the jury was entitled to believe this testimony, and that since they were the triers of the facts and judges of the weight of the testimony their judgment cannot be rejected on appeal. This rule is made applicable by the majority on their assumption that the testimony as a whole shows that the bees died as a result of contact with the poisonous dust. I take the unequivocal position that no layman, including judges, knows whether contact by poisonous dust will kill bees. The general rule relating to sufficiency of the evidence is set forth in 32 C.J.S., Evidence, § 1042, as follows:

"A verdict or finding must be based on the evidence, and cannot rest on conjecture, suspicion, or mere possibilities. It must be supported by legal and substantial evidence, and cannot be based on evidence which is inherently incredible or opposed to natural laws, common knowledge and experience, or established physical facts."

This rule has been repeatedly subscribed to by this court. In Salt River Valley Water Users' Association v. Blake, 53 Ariz. 498, 503, 90 P.2d 1004, 1007, the following statement was made:

" * * * We have repeatedly held that juries may not return verdicts on surmise or speculation, *and that when damage may have resulted from one of several causes, and that it is as probable that it may have been a cause for which defendant was not responsible as one for which it was,* a plaintiff may not recover." (Emphasis supplied.)

In Brutinel v. Nygren, 17 Ariz. 491, 506, 154 P. 1042, 1048, L.R.A.1918F, 713, the court expresses itself as follows:

" * * * To sustain the judgment in this case it would be necessary to hold that the jury in arriving at their verdict have a legal right, in the absence of any evidence in regard thereto, to conjecture and assume necessary and controlling facts, which, under the law, is beyond the province of a jury. * * *"

This statement is quoted and approved in United States Smelting, Refining & Mining Exploration Co. v. Wallapai Mining & Developing Co., 27 Ariz. 126, 230 P. 1109, and the rule was later set out in Hall v. Wallace, 59 Ariz. 503, 509, 130 P.2d 36, 38, as follows:

"A jury may not return a verdict against a defendant on surmises or guesses. * * *"

In the original opinion it was said:

"In order to determine this matter it is imperative that we now review a portion of

the evidence, but first we will state *that there seems to be nothing in the testimony that we can find to the effect that the bees of this appellee went upon the field of cotton that was sprayed.*" (Emphasis supplied.)

This portion of the original opinion is by the opinion on rehearing allowed to stand. Further on rehearing the majority opinion states:

"* * * There was no evidence at the trial that the bees went into the defendants' cotton field and there ate the poison causing their death. * * *"

I am of the opinion that this construction placed upon the evidence is unwarranted and such interpretation ignores the only and uncontradicted testimony which is herewith set forth haec verba. There was no evidence that there were other stands of bees located near defendant's field. The plaintiff on cross-examination testified:

"Q. Now, Mr. Bolon, what was your purpose in putting 64 hives of bees and establishing an arbor at that point in the desert? A. We had just bought the 80 acres of land, and there is three tamarack groves, one south and two east, we moved them there on account of those tamarack groves.

"Q. One about a mile or so southeast and two others about a mile east? Is that correct? A. I think so, yes, sir.

"Q. And that is the reason you moved your bees down there. A. That is the reason we moved our bees there, yes, sir.

"Q. And you knew as a matter of fact that the bees also work in that cotton there, don't you? A. I didn't know that, no, sir.

"Q. *Well, you knew there was nothing on your 80 acres there for the bees to feed on, didn't you? A. I knew there was a cotton field there.*

"Q. And you knew that there was nothing for the bees to feed on on that desert, that 80 acres, didn't you? A. *We didn't think they would get anything to eat off the desert.*

"Q. That is right? A. We moved them there on account of those tamarack groves.

"Q. And you also didn't object if they fed in the cotton, did you? A. We didn't consider the cotton. I don't consider short staple cotton for bees.

"Q. *But you knew that they were working in there some of the time, didn't you?* A. *I didn't know that they were or that they weren't. I suppose they were.*

"Q. *You suppose they were?* A. *Yes, some. I don't know.*" (Emphasis supplied.)

The ranch foreman of defendant testified:

"Q. The cotton was in blossom at that time, was it not? A. Yes, sir.

"Q. Did you see any bees in that field? A. Yes, you could see bees any time you went to the field."

The majority opinion stresses the holding of this court in S. A. Gerrard Co., Inc. v. Fricker, 42 Ariz. 503, 507, 27 P.2d 678, and the case of Miles v. A. Arena & Co., 23 Cal. App.2d 680, 73 P.2d 1260. In the Gerrard case this court made the following observation [42 Ariz. 503, 27 P.2d 680]:

"* * * The evidence that it was poisonous was very meager aside from the fact that it killed most of the bees that it contacted. If it killed the bees, it was because they enhaled it. It was poisonous to them."

In the California case the court found that the bees were killed by the dust drifting into the hives. In these two cases it must be assumed that there was *evidence* to support these observations. The facts found in these two cases certainly cannot control in the case before us. This court must base its ruling upon the *evidence* given in the instant case.

The judgment should be reversed and the trial court, not having granted defendants' motion for a directed verdict, should now be instructed to dismiss plaintiff's complaint.