W. B. BYNUM COOPERAGE COMPANY *v*. COULTER.

4-9595                                           244 S. W. 2d 955

Opinion delivered January 14, 1952.

*John Baxter* and *DuVal L. Purkins,* for appellant.

*Gibson & Gibson,* for appellee.

GRIFFIN SMITH, Chief Justice. The appeal is from verdicts in favor of four plaintiffs whose causes were

consolidated for trial. Each alleged damage to crops caused by W. B. Bynum Cooperage Company through its negligent use of plane-sprayed 2, 4-D, July 8th and 9th, 1949, when the corporation sought to protect 400 acres of rice planted on its 2,200 acre plantation seven miles from Dermott.[1]

A wooded area and bayou separate the riceland from any of the tracts as to which the cotton and lespedeza damages were claimed. The Midkiff planting is farthest from the corporation's operations—about a mile and three-quarters. Harold and W. B. Bynum, Jr., brothers and stockholders in the defendant company, testified that severe cotton damage occurred in their area of operations in 1949, but it was due to excessive rains. In addition to the rice crop, 400 acres were in cotton, producing 43 bales. The same acreage[2] in 1948 yielded 365 bales.

W: B. Bynum, Jr., a licensed pilot with more than 700 flying hours to his credit, testified that he was present when the rice was sprayed by an aviator who used a commercial plane. Directions were given—and, as the witness believed, were followed—to fly low, close control valves on the chemical tank before reaching the borderline of planting, and not to attain elevation for the purpose of turning while it was possible for any of the poison to escape. The witness thought that most of the flying was at an elevation of six to eight feet above the rice, and was certain that the plane did not get off of the property the corporation owned. Between 75 and 100 "runs" were probably made. When asked whether the pressure tank containing the liquid was equipped with a cutoff valve, Bynum replied, "Yes, to the best of my knowledge, because we checked the plane entirely to see that nothing was wrong with the plane."

To guard against overshooting the marginal areas, a flagman was placed 150 feet from the end of the rice

[1] R. H. Coulter claimed that damage to 12 acres amounted to $1,080, and he recovered $715. Edward Midkiff planted 18 acres to cotton and 20 acres to lespedeza. He sued for $2,300 and recovered $1,040. Joe C. McDaniel planted 13½ acres to cotton and sued for $2,100; but Earl Kincade had rented 7.28 acres of the 13½. McDaniel was awarded $552.50 and Kincade $487.50.

[2] The record does not show that the land was identical. It only shows that acreage was the same.

growth. The aviator was instructed to stop spraying when he reached the flag; for, said Bynum, an area of 600 feet would then remain within which to make the turn without getting off of the property.

County Agent Waters testified regarding the effect of 2, 4-D. What he said in this respect does not vary materially from facts in *Chapman Chemical Co.* v. *Taylor*, 215 Ark. 630, 222 S. W. 2d 820. See, also, *Burns* v. *Vaughan*, 216 Ark. 128, 224 S. W. 2d 365, 12 A. L. R. 2d 433. In the last two cases "dusting" was employed, as distinguished from application in liquid form.

Waters had received many samples of cotton damaged by the poison in question. He identified cotton plants taken from plaintiffs' fields and testified that the deterioration of leaves, squares, and roots was typical of the effects produced by 2, 4-D. Specimens had been sent to the University of Arkansas, College of Agriculture. Letters written by the head of the department of plant pathology or an assistant expressed opinions that the specimens definitely disclosed injury by 2, 4-D. In some of the letters the words "typical of" were used in referring to the cause of deterioration.

Assistant County Agent Holbrook had been called to inspect some of the crops as to which injury was alleged. He made notations August 5th and when testifying read from the memoranda. Such expressions as "Leaf injury slight," "squares showing some injury," "leaf damage and squares are affected," "slight leaf damage," "leaves showing injury," etc., were read. The crops on appellees' farms had been well cultivated,—they had been chopped out, were clean, and well cared for. Matter contained in a 1948 bulletin issued by the U. S. Department of Agriculture was brought to the jury's attention, emphasis having been placed on a table showing that 2, 4-D would kill cotton in certain circumstances. The Department warned against distributing from an airplane, adding that the dust might drift for miles, "killing or damaging susceptible crops on a neighbor's farm as well as your own." Proper nozzles on the distributing system,

accurately adjusted, [says the bulletin] "are the key to safe, thorough spraying."

The evidence is that there are at least two forms of 2, 4-D in general use: one having an ester base, the other an amine base. It was shown in the case at bar that the amine-base solution was used: that is, the powdered or crystal chemical was dissolved in water when put into the plane tank. The department of agriculture regards the ester-base poison as the more dangerous of the two.

According to William Oliver who resided in the immediate area, the plane flew above treetops in making its turns. He also testified that the wind was "right out of the northwest, coming southeast." This was sufficient to support a jury's finding that the air currents were toward the crops claimed to have been damaged, although there was other testimony in direct contradiction. Oliver said the breeze was sufficient to be felt on one's hand. It was also in evidence that Bynum (Cooperage Company) lands were lower than appellees' cultivated tracts, and therefore would be more readily affected by wet weather. On behalf of appellees it was shown that their lands drained into or were drained by the bayou. Harold Bynum admitted that excessive rains in June and July affected the company's cotton to such an extent that in July, when the rice was sprayed, he and those in interest with him had entirely abandoned the cotton.

By referring to W. B. Bynum's testimony it will be observed that he did not unqualifiedly say that the chemical tank used on the airplane was equipped with a cutoff valve. He checked "entirely" to see that nothing was wrong with the plane, and the pressure tank was equipped with a cutoff valve "to the best of his knowledge." Defense attorneys explained that they had been unable to procure attendance of the flyer.

Objection is made to the method applied by the court in determining the measure of damages. Instruction No. 2 permitted the jury to find the actual value of the crop at the time it was damaged, to consider its probable

value at maturity, less the difference between cost of production based on a full or probable crop, and to take from such production its cost, etc. The formula was not, in principle, substantially at variance from the rule sustained in *Harrington* v. *Blohm*, 136 Ark. 231, 206 S. W. 316. The jury, in respect of each plaintiff in the instant case, materially reduced the amounts claimed. We are not able to say that the court erred in giving the instruction.

The final contention is that Instruction No. 4 was binding and omitted an essential element of defense. It was objected to generally and specifically. Substance of the instruction was that if the jury should find that agents of the corporation, as reasonable men, ought to have anticipated that the poison, when used in the manner shown, might drift to appellees' property and cause damage, and if it also found that the damage occurred through negligent failure to act prudently, there should be findings for the plaintiffs.

Appellant thinks the instruction is fatally defective in that it omitted mention of essential elements of defense such as deterioration of the cotton because of defense such as deterioration of the cotton because of excessive rains and boll weevil. The court's construction of the law is not open to that objection. As worded, the instruction required, as a prerequisite to judgments, that there be a finding that 2, 4-D caused the damage.

Affirmed.