94 So.2d 293

Julian GOTREAUX

v.

Roy GARY et al.

No. 42510.

Feb. 25, 1957.

Rehearing Denied April 1, 1957.

Charles C. Jaubert, Lake Charles, for appellant.

Herschel N. Knight, Jennings, for defendants-appellees.

MOISE, Justice.

Julian Gotreaux instituted this suit for damages in the sum of $2,405.75. It is alleged that Welsh Flying Service, Inc., sprayed 2, 4–D poisoning on the rice crop grown on Roy Gary's tenant farm on July 2, 1953, and that the wind carried the herbicide to plaintiff's crop—approximately 13.3 acres of cotton and 3 acres of peas—causing the destruction of all but one bale of cotton.

Defendants denied liability and plead lack of negligence by the use of due and reasonable care, relying on Act 502 of 1952, LSA–R.S. 3:1621, and the regulations of the Louisiana Department of Agriculture and Immigration.[1]

The trial court held defendants free from any negligence and dismissed plaintiff's action. Plaintiff's appeal to the Court of Appeal, First Circuit, was transferred to this Court.

1. Act 502 of 1952 empowers the Commissioner of Agriculture and Immigration to promulgate just and reasonable rules and regulations necessary to protect crops and other valuable plants from damage arising from the use of 2, 4–D—dichlorophenoxyacetic acid and related herbicides. On March 10, 1953, such rules as above provided for were promulgated.

Plaintiff contends that defendants' actions constituted a private nuisance, and that liability for damages resulting from the maintenance of a nuisance does not depend on a question of negligence.

The record discloses that defendant Gary employed Welsh Flying Service, Inc., to spray a tenant rice crop of 240 acres on July 2, 1953. Spraying operations were commenced before 8:30 A.M., and after that hour the pilot determined that the wind was too high to continue. Gary's farm lands were located some 3¼ miles south of plaintiff's farm, and the wind was blowing from the south on July 2, 1953. There is a dispute as to the wind's velocity at the time of the spraying; however, after the spraying, the wind reached a velocity higher than that permitted by the regulations.[2] Plaintiff detected the odor of the poisoning on the morning of the operations, and when he went to the airport to request the discontinuance of the spraying Mr. Gary informed him that he was through for the day.

Plaintiff's testimony is to the effect that some eight to ten days after July 2, 1953, his cotton crop began to have curled leaves and his two crops became unproductive. His testimony is substantiated by that of adjoining farmers, which is to the effect that the 2, 4–D caused the destruction.

We find from the evidence that plaintiff's crops were destroyed and that it was from the blowing or drifting on plaintiff's crops of the herbicide sprayed by defendants.

Defendants have not proved that there were any other spraying operations conducted in the vicinity of plaintiff's farm on July 2, 1953, or within a short time before,[3] and they have not disproved the fact that the 2, 4–D, which they sprayed, came to rest in part on plaintiff's crops and caused their destruction.

We do not believe that the legal problem presented is that of a private nuisance. It resolves itself to the determination of whether the doctrine of strict liability is applicable.

In the case of Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845, 848, the defendants were free of negligence. There we held that plaintiffs, whose residences were damaged by blasting operations carried on by defendants, were entitled to recover damages as a result of an invasion of their privacy of their respective homes, inconvenience occasioned them, and mental

---

2. Sec. 8—Regulations Covering The Use of 2, 4–D and Related Herbicides, Louisiana Department of Agriculture and Immigration, Promulgated in Accordance With the Provisions of Act 502 of 1952.
"No spraying shall be carried out when wind velocity exceeds six (6) miles per hour except in isolated areas by special permit from the Commissioner."

3. Damage such as herein involved usually displays itself within 14 days after spraying with herbicides.

anguish suffered as a result of property damages. We made the following statement, which is applicable to the present controversy:

"In disposing of questions of this character, we are mindful of two important considerations: First, to give the owner of property the largest liberty possible, in the use, occupation and improvement of his own property, consistent with the right to employ modern methods and machinery in accomplishing the improvements desired; and second, that one may not use his own property to the injury of any legal right of another. This maxim of the common law, 'Sic utere tuo ut alienum non laedas', is so well established and so universally recognized that it needs neither argument nor citation of authority in its support."

Rice is one of the most important crops of Louisiana and its proper cultivation necessitates the application of herbicides. However, plaintiff could not be deprived of the privilege of raising to production his cotton and pea crops because of defendants' use of spraying operations.

Article 667 of the LSA Civil Code provides:

"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."

In the case of Tucker v. Vicksburg, S. & P. Ry. Co., 125 La. 689, 51 So. 689, we held that the grant and exercise of privileges to one does not confer the right to disregard the private rights of others.

In the instant matter, it is true that the Legislature consented to the use of herbicides, but this did not entitle defendants to injure plaintiff's crops. Although the use of the spraying operation was lawful, it was carried out in such a manner as to unreasonably inconvenience plaintiff and deprive him of the liberty of enjoying his farm. Devoke v. Yazoo & M. V. R. Co., 211 La. 729, 30 So.2d 816.

We adopt the following ruling made in the case of Fontenot v. Magnolia Petroleum Co., supra:

"We are unwilling to follow any rule which rejects the doctrine of absolute liability in cases of this nature and prefer to base our holding on the doctrine that negligence or fault, in these instances, is not a requisite to liability, irrespective of the fact that the activities resulting in damages are conducted with assumed reasonable care and in accordance with modern and accepted methods."

We believe that there is adequate proof in the record to substantiate the amount of damages alleged to have been suffered by

plaintiff. While there is some dispute as to the value of the pea crop, we do not believe that defendants have sufficiently controverted the loss alleged by plaintiff.

For the reasons assigned, the judgment of the trial court is annulled and set aside, and plaintiff is allowed judgment against the defendants in the sum of $2,405.75, together with legal interest from demand until paid; all costs to be paid by the defendants.