[No. 44542. En Banc. August 4, 1977.]

PATRICK L. LANGAN, ET AL, *Respondents,* v. VALICOPTERS, INC., ET AL, *Appellants.*

*Brooks & Larson* and *Terry A. Brooks,* for appellants.

*Felthous, Peters, Schmalz, Leadon & Fowler,* by *Douglas D. Peters,* for respondents.

*Joel E. Smith, Robert R. Redman,* and *Howard B. Breskin* on behalf of Washington State Aviation Association and International Pesticide Applicators, Inc., and *Ernest Falk, Vincent Beaulaurier,* and *Elwood Hutcheson,* amici curiae.

DOLLIVER, J.—This is an appeal from a judgment against appellants for damages resulting from their crop spraying

activities. Patrick and Dorothy Langan, respondents, own a small (2 1/2 to 3 acre) farm in the Yakima Valley. The Langans are organic farmers: that is, they use no nonorganic fertilizers, insecticides or herbicides to aid them in their farming but rely on natural fertilizers and natural pest control agents. They had planned to can and sell their produce to organic food buyers.

Valicopters, Inc., is a Washington corporation which engages in the aerial application of agricultural pesticides. Gene Bepple, one of the owners of Valicopters, Inc., was the helicopter pilot at the time of the incident giving rise to this lawsuit. The Thalheimers, doing business as Thalheimer Farms, owned and farmed the land adjoining that of the respondents. It was their land that was being sprayed by Valicopters. Simplot Soilbuilders sold the agricultural chemical to Thalheimers for aerial application.

On June 3, 1973, Bepple sprayed for Colorado beetle infestation on the Thalheimer farm with a chemical pesticide known as Thiodan. A small patch of the farm was sprayed with the chemical Guthion. While applying the pesticides to Thalheimers' property, Bepple traveled approximately 45 miles per hour while 6 to 8 feet off the ground with a 42–foot application boom extending from the sides of the helicopter. Patrick Langan testified that, during one spraying pass, the helicopter began spraying while it was over his property. This testimony was disputed. He further testified that the spray settled on the entire length of their tomato, bean, garlic, cucumber and Jerusalem artichoke rows.

The Langans and other organic farmers founded and are members of the Northwest Organic Food Producers' Association (NOFPA). The bylaws of NOFPA contain the following pertinent provisions:

7. No poisonous insecticides, repellents, herbicides, artificial fertilizers, stimulants or hormones may be used on food or in soil in which products are grown or animals are grazed. If any such item is applied by the grower to

any committed acreage that has been previously committed and certified, the acreage will be withdrawn from certification and this farmer cannot be recertified without approval of the Executive Committee.

9. No member shall be allowed to market foods or advertise food as certified organically grown by NOFPA if laboratory tests on the finished crop indicates [sic] the presence of more than ten percent (10%) of the maximum pesticide residue tolerances allowable by the Food and Drug Administration. In the event the finished crop reflects a residue higher than the allowable tolerances set forth in this section, the member's seal for any such crop shall immediately be suspended and public notice made thereof.

NOFPA Bylaws, art. 4, §§ 7, 9.

A laboratory test conducted after the spraying indicated the presence of 1.4 parts per million by weight of Thiodan on the Langans' crop tissue. The United States Department of Health Education and Welfare, Food and Drug Administration's tolerance for Thiodan on tomatoes and beans is 2.0 parts per million. Following the test results, the board of directors of NOFPA revoked the Langans' certification as organic food growers in conformance with bylaw No. 7. The Langans' entire property was decertified in conformance with the NOFPA rule which requires decertification when a portion of the land is contaminated.

Due to the decertification, the Langans did not grow their tomatoes and beans to fruition. Instead, they pulled them from the ground to prevent further contamination of the soil. The Langans had no contract to sell the contaminated tomatoes and beans commercially.

After a jury trial, a judgment in the amount of $5,500 was entered against appellants. They appealed to the Court of Appeals, Division Three. That court certified the case to this court and we accepted certification.

■ At the outset, it must be determined whether there was substantial evidence to support the jury's finding that respondents' damage occurred as a result of the spraying. Appellants contend that NOFPA erroneously interpreted

its own bylaws. They argue that neither rule No. 7 nor rule No. 9 required immediate decertification of appellants' property and that the tomatoes and beans should have been tested for chemicals when those crops had fully matured. The bylaws of that organization are essentially a contract between NOFPA and its members. *See Rodruck v. Sand Point Maintenance Comm'n,* 48 Wn.2d 565, 295 P.2d 714 (1956). In construing a contract, the intention of the parties will be given great, if not controlling, weight. *See Kennedy v. Weyerhaeuser Timber Co.,* 54 Wn.2d 766, 344 P.2d 1025 (1959).

A director of NOFPA testified that their interpretation of rule No. 7, coupled with the basic purpose of \NOFPA (to insure consumers that the products are organically grown if they are sold under the organization's seal) required decertification of respondents' farm. The Langans apparently agreed with this interpretation and did not question the legitimacy of the decertification. This decertification, which prompted the Langans to pull the crops, provided substantial evidence for the jury to conclude that they suffered damage as a result of crop spraying.

The next issue is whether the trial court erred by instructing the jury that appellants would be strictly liable for damage that was proximately caused by their aerial spraying. The trial judge gave the following instruction:

> If you find that defendants' chemicals fell upon plaintiffs' crops, you are instructed that as a matter of law the defendants are liable for such damage to plaintiffs' crops, if any, as you find was proximately caused by defendants' spray application.

Liability for damage caused by crop dusting or spraying generally is imposed on the basis of either negligence or strict liability. *See generally Liability for Injury Caused by Spraying or Dusting of Crops,* Annot., 37 A.L.R.2d 833 (1971). The courts in most jurisdictions that have held crop dusters liable have used the theory of negligence. *See, e.g., Lundberg v. Bolon,* 67 Ariz. 259, 194 P.2d 454 (1948); *Hammond Ranch Corp. v. Dodson,* 199 Ark. 846, 136

S.W.2d 484 (1940); *Miles v. A. Arena & Co.,* 23 Cal. App. 2d 680, 73 P.2d 1260 (1937); *Binder v. Perkins,* 213 Kan. 365, 516 P.2d 1012 (1973). However, other opinions which have ostensibly relied upon the principles of negligence have been criticized by legal writers because the reasoning is not clear or more nearly resembles strict liability. Comment, *Crop Dusting: Two Theories of Liability?* 19 Hastings L.J. 476, 482–89 (1968); Note, *Crop Dusting: Legal Problems in a New Industry,* 6 Stan. L. Rev. 69, 75–80 (1953).

Three jurisdictions have held crop dusting to be an activity to which the principles of strict liability apply. *Young v. Darter,* 363 P.2d 829 (Okla. 1961); *Loe v. Lenhardt,* 227 Ore. 242, 362 P.2d 312 (1961); *Gotreaux v. Gary,* 232 La. 373, 94 So. 2d 293 (1957) (applying civil law). In *Loe v. Lenhardt, supra,* Justice Goodwin, writing for the majority, noted that the dangers of spraying agricultural chemicals by aircraft has been the subject of considerable legislative attention nationwide, citing the laws of 29 states. These laws, he concluded, were evidence of the dangerous character of aerial spraying. The court recognized the activity was one capable of inflicting damage notwithstanding the exercise of utmost care by the applicator, and that the damage was within the scope of the risk created by spraying an adjoining field. The court cited *Bedell v. Goulter,* 199 Ore. 344, 362–63, 261 P.2d 842 (1953), a case involving strict liability for blasting, in which it stated:

> "* * * Basic to the problem is 'an adjustment of conflicting interests', . . . of the right of the blaster, on the one hand, to pursue a lawful occupation and the right of an owner of land, on the other, to its peaceful enjoyment and possession. Where damage is sustained by the latter through the nonculpable activities of the former, who should bear the loss—the man who caused it or a 'third person', as Judge Hand says, "who has no relation to the explosion, other than that of injury'?"

*Loe v. Lenhardt, supra* at 253–54.

In Washington, this court has adopted the Restatement (Second) of Torts §§ 519, 520 (Tent. Draft No. 10,

1964). *Pacific Northwest Bell Tel. Co. v. Port of Seattle,* 80 Wn.2d 59, 491 P.2d 1037 (1971); *Siegler v. Kuhlman,* 81 Wn.2d 448, 502 P.2d 1181 (1972). Section 519 of the Restatement provides:

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent such harm.

(2) Such strict liability is limited to the kind of harm, the risk of which makes the activity abnormally dangerous.

■ Section 520 lists the factors to be used when determining what constitutes an abnormally dangerous activity:

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others;

(b) Whether the gravity of the harm which may result from it is likely to be great;

(c) Whether the risk cannot be eliminated by the exercise of reasonable care;

(d) Whether the activity is not a matter of common usage;

(e) Whether the activity is inappropriate to the place where it is carried on; and

(f) The value of the activity to the community.

Whether an activity is abnormally dangerous is a question of law for the court to decide. *Siegler v. Kuhlman, supra;* Restatement (Second) of Torts § 520, comment (1) (Tent. Draft No. 10, 1964). In making this determination, we have considered each of the factors listed in the Restatement, section 520. We note that not all of the elements listed in section 520 must weigh equally in favor of characterizing an activity as abnormally dangerous in order that we may so find it to be.

In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) of this Section are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and

ordinarily several of them will be required for strict liability. Because of the interplay of these various factors, it is not possible to reduce abnormally dangerous activities to any exact definition. The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm which results from it, even though it is carried on with all reasonable care.

Restatement (Second) of Torts § 520, comment (f) (Tent. Draft No. 10, 1964). *See generally* Peck, *Negligence and Liability Without Fault in Tort Law,* 46 Wash. L. Rev. 225 (1971). However, in this case, each test of the Restatement is met.

§ 520(a): Whether the activity involves a high degree of risk of some harm to the person, land or chattels of others.

It is undisputed among the authorities cited to us that crop dusting involves an element of risk of harm. In Note, *Crop Dusting: Legal Problems in a New Industry,* 6 Stan. L. Rev. at 72–75, the author points out that the drift of chemicals is virtually unpredictable due to three "uncertain and uncontrollable factors: (1) the size of the dust or spray particles; (2) the air disturbances created by the [applicating aircraft]; and (3) natural atmospheric forces." The author discusses these three factors in detail and notes:

In the opinion of leading scientists who are working to alleviate the dangers of crop dusting, it is impossible to eliminate drift with present knowledge and equipment. Experience bears this out.

6 Stan L. Rev. at 75. The author states further that the problem of drift is reduced but not eliminated by the use of helicopters. Subsequent commentators have made the same observations about the uncontrollability of drift. *See, e.g.,* Comment, *Crop Dusting: Two Theories of Liability? supra* at 477–79. In this case, there is no evidence that it is possible to eliminate the risk of drift in crop spraying.

§ 520(b): Whether the gravity of the harm which may result from it is likely to be great.

Whether there will be great harm depends upon what adjoining property owners do with their land. For example, one property owner may grow wheat (a narrow–leafed crop) and his neighbor may grow peas (a broad–leafed crop). The wheat farmer may wish to spray his crop with the chemical herbicide (weed killer) 2,4–D, which kills only broad–leafed plants. If the 2,4–D drifts onto the pea farmer's property, his entire crop could be destroyed since peas are broad-leafed plants. Frear, *Chemistry of Insecticides, Fungicides and Herbicides* 316 (2d ed. 1948). The reported cases are illustrative of the many possible fact situations which indicate that neighboring property may be sensitive to and damaged by the spraying activity of an adjoining landowner. *See* Comment, *Crop Dusting: Two Theories of Liability?* 19 Hastings L.J. 476, 479 n.38. The cases cited in that note include the following situations: *S.A. Gerrard Co. v. Fricker,* 42 Ariz. 503, 27 P.2d 678 (1933) (bees killed by insecticide Dutox No. 20); *W.B. Bynum Cooperage Co. v. Coulter,* 219 Ark. 818, 244 S.W.2d 955 (1952) (cotton damaged by 2,4–D); *McPherson v. Billington,* 399 S.W.2d 186 (Tex. Civ. App. 1965) (hogs killed by arsenical). The extent of damage can be very high. *See, e.g., Crouse v. Wilbur–Ellis Co.,* 77 Ariz. 359, 272 P.2d 352 (1954) (plaintiff recovered $10,000 when his cantaloupe crop was damaged by insecticide containing sulphur); *Sanders v. Beckwith,* 79 Ariz. 67, 283 P.2d 235 (1955) (plaintiff recovered $10,000 when his dairy herd was injured by DDT and benzene hexachloride).

As the present case illustrates, it is economically damaging for an organic farmer who is a member of NOFPA to apply nonorganic materials to his crops because he would lose the association's certification. There was substantial evidence before the trial court that, once an organic farmer loses his certification, it is highly unlikely that he will be able to sell his crops on the regular commercial market due to his failure to enter into contracts with commercial

produce buyers before the season begins, and, even if he could sell his crops to a commercial produce buyer, the farmer would be unable to command as high a price for his goods as he could on the organic market.

§ 520(c): Whether the risk cannot be eliminated by the exercise of reasonable care.

The same elements that produce a high degree of risk of harm, namely the uncontrollability of dust or spray drift (§ 520(a) above), also cannot be eliminated by the exercise of reasonable care. *See* Note, *Crop Dusting: Legal Problems in a New Industry, supra* at 75.

§ 520(d): Whether the activity is not a matter of common usage.

The Restatement (Second) of Torts § 520(i) (Tent. Draft No. 10, 1964), observes "An activity is a matter of common usage if it is customarily carried on by the great mass of mankind, or by many people in the community." Although we recognize the prevalence of crop dusting and acknowledge that it is ordinarily done in large portions of the Yakima Valley, it is carried on by only a comparatively small number of persons (approximately 287 aircraft were used in 1975) and is not a matter of common usage.

§ 520(e): Whether the activity is inappropriate to the place where it is carried on.

Given the nature of organic farming, the use of pesticides adjacent to such an area must be considered an activity conducted in an inappropriate place.

§ 520(f): The value of the activity to the community.

As a criterion for determining strict liability, this factor has received some criticism among legal writers. In 2 Harper & James, *Law of Torts,* Comment to § 14.4 (Supp. 1968), the authors suggest that section 520(f) is not a true element of strict liability: "The justification for strict liability, in other words, is that useful but dangerous activities must pay their own way." *See also* Note, *Regulation and*

*Liability in the Application of Pesticides,* 49 Iowa L. Rev. 135, 144–45 (1963).

There is no doubt that pesticides are socially valuable in the control of insects, weeds and other pests. They may benefit society by increasing production. Whether strict liability or negligence principles should be applied amounts to a balancing of conflicting social interest—the risk of harm versus the utility of the activity. In balancing these interests, we must ask who should bear the loss caused by the pesticides. *See* Note, *Regulation and Liability in the Application of Pesticides, supra;* Prosser, *Law of Torts* § 59 (2d ed. 1955); *Siegler v. Kuhlman,* 81 Wn.2d 448, 502 P.2d 1181 (1972) (Rosellini, J., concurring).

In the present case, the Langans were eliminated from the organic food market for 1973 through no fault of their own. If crop dusting continues on the adjoining property, the Langens may never be able to sell their crops to organic food buyers. Appellants, on the other hand, will all profit from the continued application of pesticides. Under these circumstances, there can be an equitable balancing of social interests only if appellants are made to pay for the consequences of their acts.

We realize that farmers are statutorily bound to prevent the spread of insects, pests, noxious weeds and diseases. RCW 15.08.030 and RCW 17.10.140, .150. But the fulfillment of that duty does not mean the ability of an organic farmer to produce organic crops must be destroyed without compensation.

Thus, for the reasons mentioned above, we find that the trial court did not err by instructing the jury on strict liability.

It is next contended by all appellants that the trial court erred when it gave the following instruction on wanton misconduct:

Wanton misconduct is the intentionally doing of an act which one has a duty to refrain from doing or the intentional failure to do an act which he has a duty to do, in reckless disregard of the consequences and under such

surrounding circumstances and conditions that a reasonable man would know, or should know, that such conduct would, in a high degree of probability, result in substantial harm to another's property.

The respondents contend that sufficient evidence is provided by the testimony of Patrick Langan. He testified that the helicopter flew over himself and his house at a low level while the spray was turned on. Respondents claim that this was in violation of WAC 16–235–050, which provides:

> Aircraft pilots during spraying operations, are prohibited from turning and/or low flying . . . (2) directly over an occupied structure such as a residence, . . . except by permission of the person(s) whose occupied structure is involved.

Appellants simply claim that this evidence is insufficient to support the instruction given.

Each party is entitled to have his theory of the case presented to the jury if there is substantial evidence to support it. *Hester v. Watson,* 74 Wn.2d 924, 448 P.2d 320 (1968). We think Mr. Langan's testimony and the administrative rule amply support the giving of this instruction.

There is no reversible error; the judgment of the trial court is affirmed.

WRIGHT, C.J., ROSELLINI, HAMILTON, STAFFORD, UTTER, HOROWITZ, and HICKS, JJ., and HENRY, J. Pro Tem., concur.