352 So.2d 752 (1977)
S. L. WINSTON, Jr., et al.,
v.
STATE of Louisiana, DEPARTMENT OF HIGHWAYS.
No. 6174.
Court of Appeal of Louisiana, Third Circuit.
November 17, 1977.
Rehearing Denied December 14, 1977.
Norman L. Sisson, Robert J. Jones, Jonathan C. Harris, Ronald R. Thompson, David K. Balfour, Richard M. Sandifer, by Richard M. Sandifer, Asst. to Gen. Counsel, La. Dept. of Transp., Baton Rouge, for defendant-appellant.
Smith, Taliaferro, Seibert & Boothe, by Leo Boothe, Jonesville, for plaintiffs-appellees.
Before DOMENGEAUX, WATSON and GUIDRY, JJ.
WATSON, Judge.
Plaintiffs, S. L. Winston, Jr. and S. L. Winston, III, filed this suit against the Louisiana Department of Highways, defendant, to recover the value of four Hereford bulls which died June 26, 1973. The deaths allegedly occurred as a result of the bulls ingesting arsenic sprayed by the Department on a concrete underpass. The trial court rendered judgment in favor of plaintiff, S. L. Winston, III, the owner of the animals, and against the Department for $2,800 and the Department has appealed.
The evidence was as follows:
The Department, in answers to interrogatories, admitted spraying the highway on six occasions in a three-year period: September 13, 1971; October 8, 1971; June 2, 1972; August 8, 1972; July 10, 1973; and August 21, 1973. The chemical used was monosodium acid methanearsonate (MSA); 4.40 pounds were used for each acre.
S. L. Winston, Jr. described his plantation and the location where the cattle were *753 thought to have consumed the poison: He testified that he lives south of Vidalia, Louisiana, in Concordia Parish, on Lucerna Plantation. His son, S. L. Winston, III, operates a cattle ranch on the plantation with approximately 101 cows, two herd bulls and 11 registered, horned, two-yearold Hereford bulls, the latter being grown as commercial breeders. Louisiana Highway 15 cuts the Winston property in half and there is an underpass to allow the cattle to pass back and forth. The passageway is a large culvert or concrete tunnel with a concrete bottom. The area of the underpass is low. The Highway Department required a culvert there for drainage. When the right-of-way was secured, Winston asked that the underpass be built to accommodate cattle and it was constructed for that purpose. Winston testified that the Highway Department does not have proper drainage to divert water from the area of the underpass and allowed a reservoir of water to accumulate there. Until the Highway Department drained it after the accident, Winston said there was water in the underpass year around, because the bottom was 18 lower than the adjacent drainage ditch. Winston said he observed the Highway Department spraying the highway two or three times and was told by the crew it was an MSMA solution. Winston asked for a label on August 29, 1973, after the death of the bulls, and the crew gave him an empty bottle. Winston said the truck sprayed the underpass on this occasion. The bottle is in evidence as P-1, dated August 29.
Winston grows cotton and soybeans and used a weak solution of MSMA in 1973 as a detergent on his cotton. However, the T & P railroad bed cuts off direct drainage between the cotton and the underpass which the cattle used. The water well where Winston mixed the MSMA solution is located on the old railroad right of way. It is contained inside a 75 by 50 foot hurricane fence. Winston testified that he has continued using MSMA on his cotton with no ill effects on his cattle.
Dr. Joe Price Lancaster testified as an expert in veterinary medicine; 95% of his twenty year practice has been with large animals. He was called by Winston in 1973 about four bulls, two already dead. The two sick bulls later died. Each weighed about a thousand pounds. Lancaster suspected arsenic poisoning. Examination of one of the first to die showed inflammation and kidney damage consistent with this diagnosis. Laboratory reports on the four from the Central Diagnostic Laboratory in LeCompte confirmed that they died of arsenic poisoning. Lancaster testified that he was taught in school that the compound solution known as MSMA contains arsenic, which is a heavy metal or metalloid that is indestructible. According to Dr. Lancaster, arsenic does not ever dissipate but will always be present where it has been disseminated. Lancaster testified that he was familiar with the underpass area; water stood there and arsenic could accumulate. Dr. Lancaster's opinion was that the concrete underpass would tend to preserve the arsenic over a period of time. Dr. Lancaster, after finding arsenic, began to look for the source and observed that the bulls had been going down to the underpass to drink. Besides the four animals that died, some of the other bulls had diarrhea, which is a symptom of arsenic poisoning. According to Dr. Lancaster, they were quarantined from the underpass area and recovered.
Odis E. Randall, an employee of the LSU Agricultural Extension Service, serves as livestock agent for Concordia and two other parishes. Randall has held his present job for three years and was previously assistant county agent for eight years. He has a master's degree in agricultural economics from LSU and is knowledgeable about the pricing of cattle. Randall testified that he was familiar with the Winston cattle operations and the two-year-old bulls in question, which were of above average quality. Randall testified that a number of bulls of the same age sold at various sales for an average of $1,000.
Dennis Berry, an employee of the Louisiana Department of Transportation, is in charge of herbicide spraying operations in the northern part of the state. He testified *754 that spraying is cheaper than mowing to control Johnson grass and unwanted weeds. The problem is worse in late spring, in June and July. His department sprays approximately 3,000 acres a year or 1,000 linear miles. Berry personally instructs all of the crews about safety precautions at an annual school; they are instructed not to spray underpasses with streams or cattle in them. Fifty yards are supposed to be left on each side of such underpasses. Berry did not know whether the instructions were ever violated. Berry said that the last time Louisiana 15 was sprayed prior to the death of the bulls was September 8, 1972,[1] nine months before. Berry testified that his records indicate Highway 15 was not sprayed on August 29 when Winston said he secured the bottle from the Highway crew. Berry admitted that a stronger solution is used to spray the right-of-way than is used to spray cotton.
Henry Day, who was the operator of a spraying truck at the time of the accident, said he was familiar with the Winston property; his crew sprayed Louisiana Highway 15 on September 8, 1972. Day said the spray was cut off 50 yards in advance of the Winston underpass and not turned back on until 50 yards past it. Day had never been on a crew which failed to turn off the spray when going over this underpass.
Ben F. Dilly testified that he was spraying for the Department of Louisiana Highway 15 on September 8, 1972. There is a valve which controls the spray on the back of each truck. His particular job is to operate the boom and control the quantity of the spray. Dilly said the truck driver stops and blows his horn when the herbicide is to be cut off; and Dilly never paid much attention to which underpasses were sprayed and which were not. Dilly never stops the spray unless the driver stops the truck first.
Dr. Walter Mason, chairman of the Department of Environmental Health Sciences at Tulane University Medical Center, testified as an expert in pesticides and herbicides, particularly MSMA. Mason said that a thousand pound bull would have to ingest 1.6 ounces of arsenic to die. Mason testified that arsenic tends to bind with clay soils after it comes in contact with them. If iron is present in the soil, the arsenic would become chemically bound to it and unavailable to the cattle. It was his opinion that, because of the diluting effect of the 63.68 inches of rain during the preceding nine months, and binding with the soil, there would not have been sufficient arsenic remaining to cause the deaths of plaintiff's bulls. MSMA is completely soluble in water. Dr. Mason did state that, if MSMA was sprayed by the Department in the recommended quantity, then:
"Had one bull been able to get all of the arsenic that was put down, which would have been contingent on him eating all of the clover or all of the grass, plus what went into the soil, then a sufficient amount did exist in the area, or could have existed in the area to be fatal." (TR. 212)
The Department, after oral judgment was rendered, moved to file the deposition of Dr. P. J. Ehman in evidence and for an order of appeal. The motion to file the deposition and for appeal were granted the same day. We decline to consider the deposition, which was not available to the trial court. The filing of the Ehman deposition was not attended by proceedings seeking new trial or any other formalities which would allow its filing in evidence. The trial court apparently granted the motion out of an abundance of fairness to defendant, but this was in error.
The first issue is whether the trial court erred in finding the Department of Highways to have caused the death of the cattle.
Dr. Mason testified that the herbicide, MSMA, if sprayed in the recommended *755 amounts, would not have killed Winston's cattle because of dilution and binding with the soil. However, Dr. Lancaster testified that the four bulls died of arsenic poisoning. The trial court concluded factually that the most probable cause of that poisoning was the arsenic compound sprayed by the Department of Highways. Dr. Mason's testimony about the tendency of arsenic to bind with clay soils is not in conflict with Dr. Lancaster's testimony that the concrete bottom of the underpass would preserve the arsenic. Winston said that the water stayed year round. The arsenic on the concrete would thus have remained in solution. None of the questions to Dr. Mason considered the effect of the concrete in holding the arsenic. It is difficult to prove causation in a situation such as this. The trial court's conclusion that the spraying caused the death of Winston's bulls is not manifestly erroneous.
The second issue is whether the Department of Highways should respond in damages for the harm to Winston's cattle.
The Department was aware of the use of this underpass by Winston's cattle and in fact had constructed it to serve that purpose. The Highway Department owned the underpass. LSA-C.C. arts. 667 and 669 provide:
LSA-C.C. art. 667:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
LSA-C.C. art. 669:
"If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place."
The combination of the low bottom of the culvert and the spraying, both attributable to the Department of Highways, killed the bulls and thereby damaged Winston. Regardless of the prudence with which the spraying was conducted, the defendant Highway Department is strictly liable for the damage caused.[2]Gotreaux v. Gary, 232 La. 373, 94 So.2d 293 (1957); Joubert v. State Through State Park, etc., 345 So.2d 220 (La.App. 3 Cir. 1977). See the analysis by Professor Yiannopoulos, at 34 La.L.R. 475, of remedies available under LSA-C.C. arts. 667 and 669 for violations of the obligations of vicinage.
The amount awarded for the four bulls is not at issue.
For the foregoing reasons the judgment of the trial court is affirmed. All costs, insofar as allowed by law, are taxed against defendant-appellant, State of Louisiana through the Department of Highways.
AFFIRMED.
DOMENGEAUX, J., concurs.
NOTES
[1] It is significant that this date differs from the dates given by defendant in answers to interrogatories, casting some doubt on the accuracy of the department records. It will be recalled that Winston, Jr. testified that the underpass was sprayed on August 29, 1973, another date that does not appear in the Department records.
[2] At common law, such interference with another's rights is referred to as a nuisance, and the "sic utere" doctrine is often stated to be the basis of liability.