120

[No. 33092-0-II.   Division Two.   July 18, 2006.]

DENISE TUTTLE, *Appellant*, v. ALLSTATE INSURANCE COMPANY
ET AL., *Respondents*.

122

*Laurence R. Wagner* and *William V. Baumgartner* (of *Baumgartner Nelson & Price, P.L.L.C.*), for appellant.

*Jerret E. Sale* and *Deborah L. Carstens* (of *Bullivant Houser Bailey, P.C.*); *Douglas F. Foley* (of *Foley & Buxman, P.L.L.C.*); *Christopher M. Veley* (of *Miller Nash, L.L.P.*); and *Christopher B. Rounds (of Law Offices of Norma Ninomiya)*, for respondents.

¶1 ARMSTRONG, J. — Denise Tuttle sued Brock Gallien for personal injuries she sustained when Gallien ran into her car after it flipped on the freeway, allegedly after hitting a truck tire and wheel in the roadway. In the same suit, she joined her insurance company, Allstate, to establish underinsured motorists (UIM) coverage for her collision with the wheel and tire. The trial court granted Allstate's motion for summary judgment, ruling that Tuttle had not shown that her vehicle flipped because of a phantom vehicle's negligence as her UIM coverage required. The jury found that Gallien was not negligent, thereby denying Tuttle recovery against him. Tuttle appeals the summary judgment, arguing that the jury could have inferred that a negligent phantom vehicle left the tire and wheel in the roadway. She also appeals the jury verdict, arguing that the trial court erred in instructing the jury on the emergency doctrine. We affirm the summary judgment but reverse for error in instructing the jury on the emergency doctrine.

## FACTS

¶2 One evening in 2003, Denise Tuttle was driving south on Interstate 5 (I-5) when her car hit something in the road, causing it to flip over onto its top. Several minutes later, Brock Gallien, who was also traveling southbound on I-5, ran into Tuttle's vehicle. Tuttle was seriously injured in the accident; she missed work and incurred medical expenses.

¶3 In her answers to interrogatories, Tuttle asserted that she hit a tire on the evening of the accident. Then in her deposition, Tuttle admitted that she never actually saw the tire. She explained that a fireman told her that she hit a tire and wheel. She also admitted that she did not know how the tire and wheel got into the road or how long it had been there before she hit it. And she admitted that she did not know whether someone had deliberately rolled the tire and wheel onto the road, whether it fell from a truck or a private passenger vehicle, or who possessed the tire and wheel after the accident.

¶4 Washington State Trooper Ronald Cantwell testified that he examined a large truck wheel and tire at the accident scene and determined that Tuttle's vehicle rolled because it hit the wheel and tire.

¶5 Shari Brentin of the Woodland Fire Department recounted that she saw a truck-sized wheel and tire leaning up against the guardrail near the collision site. It appeared to Brentin that Tuttle's vehicle had hit the tire, which caused her truck to flip.

¶6 At trial, Gallien testified that he was driving south in the center lane on I-5 when he noticed people on the right side of the road waving flashlights. He thought the people were fixing a car and decided to move to the left lane, allowing the motor home on his right to move into the center lane and avoid hitting the people. Gallien put his turn signal on, checked his blind spot, and then looked forward; he saw Tuttle's vehicle "just a fraction of a second before the collision . . . occurred" as he was coming around the corner and moving into the left lane. Report of Proceedings (RP) at 287. He also said that he did not see Tuttle's vehicle before striking it. Gallien also testified that there were no flares on the left side of the road and that before he hit Tuttle's vehicle, he did not think he needed to stop.

¶7 Larry Tompkins, forensic engineer and accident reconstruction expert witness for Gallien, testified on direct that "the collision was unavoidable for Mr. Gallien." RP at 375. He also testified that it takes slightly less reaction time

to steer than it does to brake; nevertheless, according to Tompkins, Gallien did not have time to steer away from Tuttle's car. He emphasized that because Gallien was looking in his blind spot as he changed lanes, he could not have seen Tuttle's car until he hit it. On cross-examination, Tompkins admitted that if Gallien had stayed in the center lane, he would not have hit Tuttle's car.

¶8 The court instructed on the emergency doctrine:

> A person who is suddenly confronted by an emergency through no negligence of his or her own and who is compelled to decide instantly how to avoid injury and who makes such choice as a reasonably careful person placed in such a position might make, is not negligent even though it is not the wisest choice.

Clerk's Papers (CP) at 141.

¶9 Tuttle's counsel objected to this instruction, arguing that it did not apply and would confuse the jury because Gallien did not have time to make a decision. Counsel pointed to Gallien's testimony that he either did not see Tuttle's car or saw it only for a split second before he hit it.

¶10 The court ruled that there was conflicting evidence and evidence that "material was left on the highway [and] flashlights on the side of the road" and that it was for the jury to determine whether the situation presented an emergency. RP at 439.

## ANALYSIS

### Summary Judgment

¶11 Tuttle argues that the lower court erred when it granted Allstate summary judgment because she presented sufficient evidence for a reasonable jury to infer that her injuries and damages resulted from an underinsured motorist's negligence.

■ ■ ¶12 We review a summary judgment de novo. *Retired Pub. Employees Council of Wash. v. Charles*, 148 Wn.2d 602, 612, 62 P.3d 470 (2003). Summary judgment is

appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Charles*, 148 Wn.2d at 612. We consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. *Wagg v. Estate of Dunham*, 146 Wn.2d 63, 67, 42 P.3d 968 (2002); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

A. *UIM Coverage under Tuttle's Policy*

¶13  At the time of the collision, Tuttle had UIM coverage with Allstate. The pertinent policy language states:

> We will pay damages for bodily injury or property damage which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle. Injury must be *caused by accident* and *arise out of the ownership, maintenance or use of an underinsured motor vehicle.*

CP at 40 (emphasis added).

¶14 Under that policy, a *phantom* motor vehicle can qualify as an "underinsured motor vehicle." Specifically, the policy states that an "underinsured motor vehicle" can be:

> (5) a *phantom motor vehicle* which causes bodily injury, death or property damage to an insured person and has no physical contact with the insured person or the vehicle which the insured person is occupying at the time of the accident.

CP at 40 (emphasis added). Tuttle asserts that her injuries arose out of the ownership, maintenance, or use of an underinsured *phantom* motor vehicle.

¶15 Interpretation of an insurance contract is a question of law, which we review de novo. *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 171, 110 P.3d 733 (2005) (citing *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 424, 38 P.3d 322 (2002)). We construe an insurance policy as a whole and give it a " 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' " *Quadrant Corp.*,

154 Wn.2d at 171 (quoting *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 666, 15 P.3d 115 (2000)). If the policy language is clear and unambiguous, we enforce it as written. *Quadrant Corp.*, 154 Wn.2d at 171. If the language is ambiguous, we construe the ambiguity in favor of the insured. *Quadrant Corp.*, 154 Wn.2d at 171-72.

¶16 Initially, Tuttle must show that her loss falls within the scope of the policy coverage. *See Olivine Corp. v. United Capitol Ins. Co.*, 147 Wn.2d 148, 164, 52 P.3d 494 (2002), *review denied*, 153 Wn.2d 1011 (2005).

"Accident"

¶17 Allstate asserts that even if Tuttle could establish that her injuries arose out of the ownership, maintenance, or use of a motor vehicle, she has not shown that an accident caused those injuries because there was no evidence as to whether the tire was in the road due to a negligent or an intentional act. Specifically, Allstate contends that even if a fact finder could infer that Tuttle hit the tire and wheel, she presented no evidence that the tire was in the roadway because of a phantom driver's negligence. Allstate reasons that the tire may have come off a vehicle because of a third party's negligent installation or maintenance or someone may have intentionally thrown the tire off a vehicle.

¶18 If an insurance policy does not define "accident," the term must be given its popular and ordinary meaning. *Roller v. Stonewall Ins. Co.*, 115 Wn.2d 679, 684-85, 801 P.2d 207 (1990) (citing *Harrison Plumbing & Heating, Inc. v. N.H. Ins. Group*, 37 Wn. App. 621, 624, 681 P.2d 875 (1984)), *overruled on other grounds by Butzberger v. Foster*, 151 Wn.2d 396, 408, 89 P.3d 689 (2004). The ordinary meaning of an accidental loss is " 'when [something] happens without design, intent, or obvious motivation.' " *Roller*, 115 Wn.2d at 685 (quoting *Federated Am. Ins. Co. v. Strong*, 102 Wn.2d 665, 674, 689 P.2d 68 (1984)). Accordingly, "an intentional act can never be an 'accident' " and " 'accident' is not a subjective term." *Roller*, 115 Wn.2d at

685 (citing *Grange Ins. Co. v. Brosseau*, 113 Wn.2d 91, 95, 776 P.2d 123 (1989)). As a result, "the perspective of the insured as opposed to the tortfeasor is not a relevant inquiry." *Roller*, 115 Wn.2d at 685.

¶19 Generally, a UIM (phantom vehicle) claimant will be able to prove an accident with evidence of how the phantom vehicle was being operated. For example, a vehicle might stray over the center line into the claimant's travel lane and then swerve back, causing an accident without a collision. Under such circumstances, the fact finder could infer that the phantom driver did not intentionally cause a near head-on collision. But here, Tuttle had no evidence of how the tire and wheel got into the roadway. And the mere presence of the tire in the roadway does not create a reasonable inference that the accident was caused by the phantom driver's negligence. It is entirely plausible that the tire came off a moving truck because it was negligently installed by someone—either the driver or a third party. If a third party negligently installed the wheel, then Tuttle has no claim against the owner or operator of the vehicle and, thus, no UIM claim. It is also entirely plausible that the wheel and tire was a spare on a large truck and came loose from its fastenings. If so, it is possible that the truck driver was negligent in failing to inspect the wheel and tire fastenings. But it is also possible that a reasonable inspection would not have revealed any problem with the fastenings. In short, Tuttle provided no evidence that would support an inference that the truck driver or owner negligently caused the wheel and tire to be in her lane of travel.

¶20 Tuttle cites an Alabama case, *Khirieh v. State Farm Mutual Automobile Insurance Co.*, 594 So. 2d 1220 (Ala. 1992). In *Khirieh*, the insureds braked to avoid a truck bench seat lying in the middle of a busy highway during "lunch hour" traffic and were then hit by the car following behind. *Khirieh*, 594 So. 2d at 1221-22. The court held that the insureds' injuries arose out of another's use of an underinsured phantom motor vehicle. As here, no witness testified that he or she saw the truck bench seat fall from a

vehicle; however, it was undisputed that the bench seat was in the road and that the insureds collided with it. *Khirieh*, 594 So. 2d at 1223.

¶21 In *Khirieh*, the UIM claimants argued that an uninsured phantom motorist had negligently allowed the truck bench seat to be in the roadway. *Khirieh*, 594 So. 2d at 1221-22. Relying on the doctrine of res ipsa loquitur, they reasoned that a truck bench seat would not find its way onto an interstate highway in heavy traffic in Birmingham other than by falling off some moving vehicle. *Khirieh*, 594 So. 2d at 1222. As such, they asserted that they had substantial evidence from which a jury could infer that their injuries arose out of another's maintenance or use of a phantom motor vehicle. *Khirieh*, 594 So. 2d at 1222. The Supreme Court of Alabama agreed.[1]

¶22 The doctrine of res ipsa loquitur spares the plaintiff the requirement of proving specific acts of negligence in cases where (1) "a plaintiff asserts that he or she suffered injury, the cause of which cannot be fully explained" and (2) "the injury is of a type that would not ordinarily result if the defendant were not negligent." *Pacheco v. Ames*, 149 Wn.2d 431, 436, 69 P.3d 324 (2003). In such cases the jury is permitted to infer negligence. *Pacheco*, 149 Wn.2d at 436 (citing *Miller v. Kennedy*, 91 Wn.2d 155, 159-60, 588 P.2d 734 (1978)). Nevertheless, the court will apply res ipsa loquitur only if the evidence shows:

> "(1) the accident or occurrence producing the injury is of a kind which ordinarily does not happen in the absence of someone's negligence, (2) the injuries are caused by an agency or instru-

---

[1] The *Khirieh* court emphasized that the *accident* was not alleged to have been caused by the "instrumentality of a motor vehicle, but rather, by a truck bench seat." *Khirieh*, 594 So. 2d at 1223. It explained that the plaintiffs had no burden of proving otherwise in order to apply res ipsa loquitur. *Khirieh*, 594 So. 2d at 1223. As clarification, the court said that "[t]he alleged involvement of a phantom motor vehicle is an issue separate from the issue of negligence, i.e., the application of res ipsa loquitur." *Khirieh*, 594 So. 2d at 1223. The court maintained that the question of whether a phantom motor vehicle was somehow involved "relates to the separate issue of whether [the plaintiffs'] injuries arose out of the use of a motor vehicle, not whether the vehicle itself, as an instrumentality, caused their injuries." *Khirieh*, 594 So. 2d at 1223.

mentality within the exclusive control of the defendant, and (3) the injury-causing accident or occurrence is not due to any voluntary action or contribution on the part of the plaintiff."

*Pacheco*, 149 Wn.2d at 436-37 (quoting *Zukowsky v. Brown*, 79 Wn.2d 586, 593, 488 P.2d 269 (1971)).

¶23 The exclusive control element requires the defendant, who is the person most likely to know how the accident happened, to come forward with the explanation. *Pacheco*, 149 Wn.2d at 437. But if the defendant does not have exclusive control, " 'he cannot offer a complete explanation, and it would work an injustice upon him to presume negligence on his part and thus in practice demand of him an explanation when the facts indicate such is beyond his ability.' " *Pacheco*, 149 Wn.2d at 437 (quoting *Morner v. Union Pac. R.R.*, 31 Wn.2d 282, 296, 196 P.2d 744 (1948)).

¶24 *Khirieh* does not help Tuttle. Allstate did not have exclusive control over the wheel and tire—the injury-causing instrumentality. And even if we consider the phantom driver as the defendant for a res ipsa loquitur analysis,[2] Tuttle cannot show that the driver had exclusive control over the wheel and tire. The wheel may have come off the vehicle because a third party negligently installed it, or someone may have intentionally rolled it into the road. If so, the phantom driver did not have exclusive control of the instrumentality.

¶25 We conclude that the trial court did not err in granting Allstate summary judgment. Tuttle offered no evidence that her collision with the wheel and tire was an accident caused by a phantom vehicle.

B. *Jury Instructions*

1. Emergency Instruction

¶26 Tuttle next claims that the trial court erred in instructing the jury on the emergency doctrine. She asserts

---

[2] Such an assumption would frustrate the purpose of the exclusive control factor—requiring the defendant to offer an explanation the plaintiff cannot provide. Allstate does not know the cause, and it has no way of locating the phantom driver who can provide one.

that the undisputed evidence is that Gallien had no time to react at all, much less make a choice between alternative courses of action. We agree.

¶27 A trial court must instruct the jury only on theories that are supported by substantial evidence. *Cooper's Mobile Homes, Inc. v. Simmons*, 94 Wn.2d 321, 327, 617 P.2d 415 (1980) (citing *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 866, 567 P.2d 218 (1977)). Generally, we review a trial court's decision on whether to give an instruction for an abuse of discretion. *See State v. Walker*, 136 Wn.2d 767, 771-72, 966 P.2d 883 (1998) (citing *State v. Lucky*, 128 Wn.2d 727, 731, 912 P.2d 483 (1996), *overruled on other grounds by State v. Berlin*, 133 Wn.2d 541, 544, 947 P.2d 700 (1997)). But we review de novo a trial court's decision to give an instruction based on a ruling of law. *See Walker*, 136 Wn.2d at 772 (citing *Lucky*, 128 Wn.2d at 731). Here the question is one of law: whether the emergency doctrine applies to these facts. *See Walker*, 136 Wn.2d at 772.

¶28 The emergency doctrine applies when a person has been placed in a position of peril and must make an instinctive choice between courses of action after the peril has arisen. *See Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 197, 668 P.2d 571 (1983) (citing *Sandberg v. Spoelstra*, 46 Wn.2d 776, 285 P.2d 564 (1955)). An emergency doctrine instruction is appropriate only when the trier of fact is presented with evidence from which it can conclude that the emergency arose through no fault of the party seeking to invoke the doctrine. *Brown*, 100 Wn.2d at 197 (citing *Mills v. Park*, 67 Wn.2d 717, 409 P.2d 646 (1966)). " 'The doctrine excuses an unfortunate human choice of action that would be subject to criticism as negligent were it not that the party was suddenly faced with a situation which gave him no time to reflect upon which choice was the best.' " *Brown*, 100 Wn.2d at 197 (quoting *Zook v. Baier*, 9 Wn. App. 708, 714, 514 P.2d 923 (1973)). Further, if the evidence is conflicting as to whether the doctrine applies, the court should give the instruction. *Bell v. Wheeler*, 14 Wn. App. 4, 6, 538 P.2d 857 (1975).

¶29 Gallien gave conflicting evidence as to whether he saw Tuttle's vehicle before hitting it. He testified that he saw it a split second before the collision but also said that he did not see it at all before the collision. The jury could accept his split second testimony, but even so, he made no decision at that point. The only decision he made was the earlier one to move to the left lane when he saw the people on the right side of the road. But he made that decision after reflecting on the safest course of action. He testified that he moved to the left to allow room for the motor home on his right to move into the center lane; he signaled, checked his blind spot, and started moving into the left lane; then he hit Tuttle's vehicle. Because Gallien had time to and did reflect on this decision, the emergency doctrine does not apply. We conclude that the court erred in instructing the jury on the emergency doctrine.

¶30 Moreover, we cannot say that giving the instruction was harmless error. The emergency doctrine excuses a driver for possibly negligent driving if the jury believes the negligence was simply a poor choice by a driver facing an immediate and sudden emergency. The jury here may have believed that Gallien was negligent for not slowing when he first realized something was amiss along side the road. If it then applied the emergency doctrine, it may have felt obligated to excuse Gallien for the failure. Under these circumstances, we cannot say that the verdict would have been the same without the emergency doctrine instruction.

2. Nonparty At-Fault Instruction

¶31 Gallien asks us to address the issue of whether the trial court should have given a nonparty at-fault instruction. But Gallien did not cross-appeal. Thus, we decline to consider the issue. *See* RAP 5.1(d); *Phillips Bldg. Co. v. An*, 81 Wn. App. 696, 700 n.3, 915 P.2d 1146 (1996).

¶32 We affirm the summary judgment, reverse for error in instructing the jury on the emergency doctrine, and remand for new trial as to Gallien.

HOUGHTON and PENOYAR, JJ., concur.